STATE OF NEBRASKA, APPELLEE, V.
JESSE M. GUTIERREZ, APPELLANT.

STATE OF NEBRASKA, APPELLEE, V.
ADAM P. SOMMER, APPELLANT.
726 N.W.2d 542

Filed January 26, 2007. Nos. S-05-979, S-05-980.

996

Michael P. Meckna and Jill A. Daley, of Gallup & Schaefer, for appellant Jesse M. Gutierrez.

Jerry M. Hug and Alan G. Stoler, P.C., L.L.O., for appellant Adam P. Sommer.

Jon Bruning, Attorney General, and James D. Smith for appellee.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ., and HANNON, Judge, Retired.

GERRARD, J.

## I. NATURE OF CASE

In separate informations filed October 1, 2004, Jesse M. Gutierrez and Adam P. Sommer (collectively the defendants) were each charged with two counts of first degree murder, one count of attempted first degree murder, and three counts of use of a deadly weapon to commit a felony in connection with the killings of Daniel Lopez and Maria Ojeda and the attempted killing of Marcos Lucero. The cases were consolidated for jury trial, and the jury returned verdicts of guilty on all charges. Both of the defendants were sentenced to consecutive terms of life imprisonment for the first degree murder convictions and consecutive terms of 50 to 50 years' imprisonment for each of the remaining convictions. Both of the defendants have appealed. Because the cases were tried together and the defendants' appellate arguments are substantially the same, we consider these appeals together. For the reasons that follow, we affirm the convictions and sentences in both cases.

## II. BACKGROUND

Generally described, the State's theory of the cases was that Lucero, Lucero's nephew Gutierrez, and Gutierrez' friend Sommer had been involved in the transportation and distribution of marijuana. Lucero, who lived in Arizona, obtained marijuana from Mexico through his connections there and transported it to Nebraska for sale. Differences arose between Gutierrez and Lucero, so Lucero ended his partnership with Gutierrez and established a partnership with Lopez. The State theorized that Gutierrez and Sommer tried to kill Lucero so they could stay in business by dealing with Lucero's connections directly.

Lucero explained at trial that he had been involved in smuggling and used his connections to establish a marijuana business with Gutierrez. Sommer helped, as did Ojeda, Lucero's girl friend. David Bowen, a friend of Gutierrez, testified that in November 2003, Gutierrez invited him to join the marijuana distribution business, and he agreed. Bowen was introduced to Lucero, who served as Bowen's contact in Arizona for obtaining marijuana. Bowen lived in a house on Drexel Street in

Omaha that was used to distribute the marijuana. Bowen explained that Carlos Carreon, Ojeda's brother, was at the top of the drug operation.

Lucero said that from the beginning, Gutierrez shortchanged Lucero the money that Gutierrez was supposed to pay him after the marijuana was distributed. Later, marijuana started to disappear as well, but Lucero did not confront Gutierrez about his suspicions. After Ojeda made a trip to Omaha, however, Ojeda told Lucero that Gutierrez had shortchanged her, treated her disrespectfully, and made sexual advances toward her. Lucero finally confronted Gutierrez, and then told Sommer that he was taking his business elsewhere. But Lucero told Gutierrez that he still expected Gutierrez to pay the money that Gutierrez owed. Bowen confirmed that in the days prior to March 9, 2004, Gutierrez and Lucero had argued and that Gutierrez had told Bowen that Gutierrez owed Lucero money. Lucero said that Lopez, who also lived in Arizona, was a close friend and that when Gutierrez became unreliable, Lucero and Lopez agreed to a new arrangement to distribute marijuana in the Omaha area. Eventually, Lucero and Ojeda came to Omaha to attempt to collect the money Gutierrez owed. Lucero tried to call Gutierrez and searched for him, but was unable to reach him.

Nicole Van Woensel, a girl friend of Gutierrez, testified that in January or February, Lucero had contacted her demanding the money that Gutierrez owed Lucero. Van Woensel testified that

> the conversation that I had with [Lucero] was [Lucero] asking me for money, wanting me to wire him approximately $1500, and when I told him I didn't have that money, he started telling me that [Gutierrez] was shorting money on the loads and that [Gutierrez] wasn't paying on time and that [Gutierrez] wasn't keeping in contact with [Lucero] and [Ojeda] and so there was just a lot of conflict. And [Gutierrez] was very upset that I had talked to him about that and told me that [Lucero] was going crazy and he had to get rid of him and told me that if [Lucero] ever called me again, not to answer and just pretend like we had broken up.

John Griego testified that he had been brought into the marijuana business by Gutierrez and transported marijuana for him. On March 8 or 9, 2004, Griego gave Gutierrez' new telephone

number to Ojeda. Lucero directed Ojeda to call, hoping that Gutierrez would answer because Gutierrez might not recognize Ojeda's telephone number. Ojeda reached Gutierrez and discovered that Gutierrez was in Arizona.

Lopez had also traveled to Omaha with his fiancée, Esperanza Carranza. They had planned to leave Omaha on March 8, 2004, but had been unable to travel, and Lopez made arrangements with Lucero to get back to Arizona. Lucero picked up Lopez and Carranza from their hotel and took them to a restaurant. From there, they went to a house rented by Lucero and Lopez for Thomas Romero, who was also involved in the marijuana operation, and Lopez and Carranza spent the night of March 8 there with Lucero and Ojeda.

The next day, Lucero used the new number to call Gutierrez again, from a pay telephone, and said that Gutierrez sounded "surprised" when he answered the telephone and found it was Lucero. Lucero again demanded payment, and Gutierrez said Lucero "would be contacted" by Sommer shortly, because Sommer and the money were in Omaha. Sommer called Lucero and told Lucero to meet him at Bowen's house on Drexel Street.

Lucero described how he and Lopez went to Bowen's house, but Sommer was not there. Bowen testified that Lucero and Lopez knocked on Bowen's door, claiming that Sommer had told them to come there to pick up their money. Lucero tried to call Gutierrez and Sommer, but was unable to reach them. Then, after leaving, Lucero received another call from Sommer, who told him to come back to the house to meet Sommer and get the money he was owed. They returned, and again Bowen told them that Sommer was not there.

By the time Lucero and Lopez left Bowen's house on Drexel Street for the second time, Lopez was driving and Lucero was riding in the front passenger seat, while Ojeda was in the back seat on the driver's side and Carranza was on the passenger's side. Lucero explained that after they drove away the second time, Sommer called again and suggested meeting at a nearby restaurant. Carranza said that Lucero received the call just after leaving the house, as they reached a stop sign. Then, Lucero said, "I still had the phone in my hand when all the bullets started flying." Someone began shooting at the vehicle, shattering the

windows on the driver's side. Lopez and Ojeda were shot. Because the driver had been shot, the vehicle rolled forward out of control, until Lucero gained control of the vehicle and stopped it. Carranza called the 911 emergency dispatch service, but Lopez and Ojeda died of gunshot wounds. Lucero waited at the scene for the police. Telephone records are consistent with Lucero's testimony regarding the calls that were made.

Det. Ken Kanger was working for the Omaha Police Department's homicide/assault unit at the time and was called to investigate the killings. Kanger was informed that the victims had been at a house near 19th and Drexel Streets, later identified as Bowen's, and that broken glass and spent shell casings had been found a couple of blocks away, at the intersection of 21st and Drexel Streets. The glass fragments were found in the street, while the shell casings were found behind some bushes at the corner of the intersection. The victims' vehicle had been found approximately four blocks away. Several bullet holes were found in the vehicle, as were several bullet jackets and fragments. In short, the physical evidence suggested that the victims had left Bowen's house at 19th and Drexel Streets and driven to the intersection of 21st and Drexel Streets. At that intersection, the perpetrators had shot at the vehicle from behind the bushes. The vehicle continued moving until it came to rest some distance away.

Christina Mace, a girl friend of Gutierrez, testified that in late February, Gutierrez told her that he and Lucero were arguing because of Ojeda and because Gutierrez owed Lucero money. Mace said that she traveled to Arizona in March 2004, and Gutierrez joined her on March 8. Gutierrez made a trip to Mexico and explained that he had gone to talk to someone about "cutting out" Lucero, because, according to Gutierrez, Lucero had threatened his life. While in Arizona, Gutierrez used an automatic teller machine, and Mace testified that Gutierrez explained he had to do that "so they would know he was in Arizona." Mace said that later, after a telephone call to Omaha, Gutierrez told her that "it's done," that "they," meaning Sommer and a companion, had killed Lucero. However, after Gutierrez and Mace got back to Omaha, Gutierrez and Sommer told Mace that Lucero was not hit and that two other people, including

Ojeda, had been killed instead. Mace also overheard a conversation between Gutierrez and Sommer, in which Sommer wanted more money and Gutierrez refused because Sommer "didn't do the job right."

The day after the killings, Gutierrez called Griego and told him to get his family out of town because "they just killed [Ojeda] last night." Later, Gutierrez had dinner with Van Woensel and said that he had gotten permission from Carreon, Ojeda's brother and Lucero's marijuana supplier, to take Lucero "out of the game" before the killings. Van Woensel said Gutierrez explained that

> some shit went down up in Omaha and he didn't know exactly what happened. [Gutierrez] said that [Ojeda] had been murdered and [Lucero]'s driver had been murdered and he didn't know what happened to [Lucero]. He told me that he was in Arizona. He had specifically gone down there so that there was no way they could pin it on him. He said he had plane tickets and transaction receipts and stuff from down there that proved his whereabouts for the murders. He said that he was very scared because [Carreon] was coming after him and there had already been threats made. He said that once he could explain to [Carreon] what happened and that [Ojeda] was not supposed to be involved in the murders, that everything would be all right. He told me that — he told me that [Ojeda] was not supposed to be up in Omaha; that it was only supposed to be [Lucero] and [Lucero's] driver in the attack.

Daniel King had been involved in purchasing substantial quantities of marijuana from Gutierrez and reselling it. King testified that Gutierrez came to King's apartment in early April 2004. Gutierrez said the police were looking for him because they suspected him of murder. According to King, Gutierrez denied involvement in the killings, but said "his boy," whom King took to mean Sommer, had been involved. However, Gutierrez also said that "it was something that had to be done." King asked again whether Gutierrez had been involved, to which Gutierrez replied, "what do you think?" Gutierrez asked if he could stay at King's residence, but King refused.

On July 2, 2004, Kanger received a telephone call from Christopher Haukaas, who was in the Douglas County Correctional Center. Kanger met with Haukaas, who provided information about the shooting. Haukaas testified that he was a friend of Sommer and had become involved in selling marijuana with him.

Sommer introduced Haukaas to Gutierrez in January or February 2004. Haukaas said that during their conversation, Gutierrez made references to having Lucero "taken out" so that Gutierrez could take over his business. Essentially, Gutierrez indicated that with Lucero out of the way, Gutierrez could go directly to the people who supplied Lucero with marijuana.

On the evening of March 9, 2004, Haukaas was at his girl friend's apartment. Sommer came to the apartment and took Haukaas to pick up some marijuana. On the way, Sommer used pay telephones to make some calls; in particular, he used a pay telephone at 60th and Grover Streets. After the call, Sommer told Haukaas that he wanted Haukaas to steal a car. Haukaas agreed, and they stole a white Buick. Sommer had a bag full of money and two guns, one of which he gave to Haukaas. The two drove to a location near Drexel Street, where they waited in some bushes, and Sommer made some calls on Haukaas' cellular telephone.

Telephone records corroborated Haukaas' testimony and established that a telephone call was made to Lucero's telephone from a pay telephone at 60th and Grover Streets. Telephone records also show that around the time of the pay telephone call, two cellular telephone calls were made from Sommer's cellular telephone to Gutierrez' telephone and that Sommer's calls were connected through the southeast sector of a cell tower at 71st Street and West Center Road, a little over a mile northwest of 60th and Grover Streets.

Haukaas said that he was expecting a marijuana deal to occur. A truck pulled up, and Haukaas went through the bushes toward the street. Then, Haukaas said, he heard gunshots and saw Sommer shooting at the truck. Haukaas drew his gun and fired in the same direction as Sommer. Haukaas and Sommer ran back to the stolen car, and Sommer directed Haukaas to drive in the direction of the truck, saying "I have to get him, I have to get

him. Just follow him." According to Haukaas, after they left the scene, Sommer explained that "that was [Gutierrez'] uncle and we were going to get paid for what we did if we got him." Haukaas refused, and sped in the other direction. Haukaas said that they went to an apartment complex near the 60th and Grover Streets location where Sommer had used the pay telephone and that they called a friend for a ride home.

Haukaas continued to associate with Sommer and Gutierrez after the killings. Sommer later told Haukaas that they had killed the wrong people.

Based on Haukaas' information, Kanger investigated the possibility of a stolen white Buick and found that a Buick consistent with Haukaas' information had been reported stolen on March 9, 2004, and recovered from the approximate location where Haukaas said the vehicle had been abandoned. Telephone records were also consistent with the rest of Haukaas' testimony, indicating that approximately 30 minutes after Carranza called 911, Sommer's cellular telephone received a call from Gutierrez' telephone, and that the call was connected to Sommer's telephone through the cell tower at 71st Street and West Center Road. Ballistics evidence also established a connection between the weapons used to kill Ojeda and Lopez and the weapons fired by Sommer and Gutierrez on rural property owned by Sommer's relatives.

Testifying for the defense, Kip Kelly said that he had been Romero's boyfriend and that Romero had said to him that Lopez had been killed because he "knew too much and they wanted to shut him up." Romero denied both the statement and the romantic relationship. In addition, Sommer's parents and fiancée offered alibi testimony, generally indicating that Sommer was home on the night of the killing.

## III. ASSIGNMENTS OF ERROR

Both of the defendants assign, consolidated and restated, that the district court erred in (1) overruling their *Batson* objections to the removal of juror No. 66; (2) denying their motions to exclude Haukaas' testimony because of the State's alleged failure to comply with the notice requirements applicable to jailhouse informers; (3) permitting a chart as a demonstrative

exhibit; (4) overruling their objections to the admission, as coconspirator statements, of purported hearsay; and (5) issuing supplemental instructions to the jury. Separately, Gutierrez assigns that the court erred in (6) denying his request for a continuance and motion for mistrial based on incomplete discovery. Sommer assigns that the court erred in (7) overruling his relevance and *Daubert* objections to the admission of cellular telephone records. Finally, both of the defendants assign that the court erred in (8) finding the evidence to be. sufficient to support the verdicts and (9) committing cumulative error.

## IV. ANALYSIS

### 1. *BATSON* OBJECTION

#### (a) Background

Juror No. 66 was single and had worked for a manufacturing company for about 1½ years, and before that job, she had done clerical work. She had attended technical college, but had not obtained a degree, and has one child. It appears from the record that juror No. 66 was Hispanic and lived near the scene of the killing. It is also worth noting that juror No. 200, another juror who was struck by the State, lived approximately six blocks from the scene of the killing.

After the parties exercised their peremptory strikes, both of the defendants joined in a *Batson* objection to the State's use of a peremptory strike to remove juror No. 66 from the venire. See *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). The court responded:

> It's my understanding that under a <u>Batson</u> motion, I have to find that there is — let's see. I don't want to say this off the cuff. I have to find that the facts and other relevant circumstances give rise to an inference that the prosecutor used those — or I guess in this case the challenge to exclude a potential juror because of race or in this case [ethnicity].
>
> I looked up that juror's address and it's . . . right in the heart of the area where the shooting in this case took place. I am not sure that I should even go any further with this, but because of the fact that you have made the motion and it's a very serious case, I will ask the State to articulate

your reason, but, frankly, I am not sure there is even a necessity, given the address of the person.

The State explained that it had exercised strikes against both juror No. 66 and juror No. 200 because they lived close to the relevant area. The State also explained that juror No. 66 was single, had a short work history, and had "very little or less education than some of the other women that we kept." Based on that explanation, the court overruled the *Batson* objection.

(b) Standard of Review

A trial court's determination of whether a party has established purposeful discrimination in jury selection is a finding of fact and is entitled to appropriate deference from an appellate court because such a finding will largely turn on evaluation of credibility. *State v. Robinson, ante* p. 582, 724 N.W.2d 35 (2006). A trial court's determination that there was no purposeful discrimination in a party's use of his or her peremptory challenges and a trial court's determination of the adequacy of a party's neutral explanation of its peremptory challenges are factual determinations that will not be reversed on appeal unless clearly erroneous. *Id.*

(c) Analysis

In *Batson*, the U.S. Supreme Court held that the Equal Protection Clause of the 14th Amendment forbids prosecutors from using peremptory challenges to strike potential jurors solely on account of their race. See *Robinson, supra.* The defendants argue that the State exercised a peremptory challenge to remove juror No. 66 solely on account of race.

The evaluation of whether a party has used peremptory challenges in a racially discriminatory manner is a three-step process. See, *Rice v. Collins*, 546 U.S. 333, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006); *Robinson, supra.* First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. See *id.* A defendant satisfies the requirements of this step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred. *Johnson v. California*, 545 U.S. 162, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005); *Robinson, supra.* Second, if the requisite

showing has been made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. See, *Rice, supra*; *Robinson, supra*. Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. *Id.* Third, the trial court must then determine whether the defendant has carried his or her burden of proving purposeful discrimination. See *id*. The final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. *Id.*

In these cases, while there was some question whether the defendants had made a prima facie case at the first step in the analysis, the State was nevertheless asked to tender a race-neutral explanation for the strike. The trial court then evaluated the persuasiveness of that explanation in determining, pursuant to the third step, that the defendants failed to carry their burden of proving a racial motivation for the strike. Thus, whether or not the defendants made a prima facie showing is moot, and we consider whether the trial court's final determination was clearly erroneous. See, *Hernandez v. New York*, 500 U.S. 352, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991); *State v. Robinson, ante* p. 582, 724 N.W.2d 35 (2006).

For Gutierrez' part, he makes a bare assertion that the State "propounded a bogus explanation" to remove juror No. 66 from the jury on account of her race. Brief for appellant Gutierrez at 63. But a prospective juror's residence close to the scene of the crime can be a legitimate race-neutral explanation for a strike. See *Robinson, supra*. Gutierrez offers nothing in the way of argument as to what in the record affirmatively demonstrates that the court clearly erred in believing the State's explanation. Nor, upon our review, is there much in the record that would support such an argument.

In other cases, for example, courts reviewing a *Batson* determination have relied on factors such as (1) whether members of the relevant racial or ethnic group served unchallenged on the jury and whether the striking party struck as many of the relevant

racial or ethnic group from the venire as it could, (2) whether there is a substantial disparity between the percentage of a particular race or ethnicity struck and the percentage of its representation in the venire, and (3) whether there is a substantial disparity between the percentage of its representation on the jury. See, e.g., *U.S. v. Ochoa-Vasquez*, 428 F.3d 1015 (11th Cir. 2005), *cert. denied* 549 U.S. 952, 127 S. Ct. 380, 166 L. Ed. 2d 268 (2006). This is because the act of striking jurors of a particular race takes on meaning only when coupled with other information, such as the racial composition of the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck. See *id.*

The record in these cases does not permit us to consider such a context for the State's peremptory strikes, because the defendants' perfunctory *Batson* challenge established little more than that a single Hispanic member of the venire had been removed. We have no information about the racial composition of the venire or the jury that was sworn. The only information the record contains about peremptory strikes is that jurors Nos. 66 and 200 were struck by the State—the remaining strikes are unknown. Therefore, the record in these cases does not demonstrate that the court clearly erred in determining that the defendants failed to carry their burden of proving purposeful discrimination.

Sommer's argument is slightly different. Although he appears to concede that juror No. 66's residence near the crime scene was a valid reason for the State's strike, Sommer argues that the district court aided the State by propounding its own race-neutral explanation for the strike before one was offered by the State. From that, Sommer concludes that the *Batson* challenge should have been sustained.

But Sommer is simply incorrect in arguing that the court erred in commenting on the strength of the defendants' prima facie showing that the State had engaged in purposeful discrimination. A trial court generally is not impermissibly expressing an opinion when it makes ordinary rulings during the course of the trial. *State v. Privat*, 251 Neb. 233, 556 N.W.2d 29 (1996). Moreover, Sommer seems to be conflating the merits of his *Batson* challenge with the way in which it was overruled. Even

if the trial judge acted improperly in ruling on the *Batson* challenge, the problem would be the impropriety, not the State's use of peremptory strikes. In other words, the issue in this appeal is still whether the court's ultimate determination on the *Batson* challenge was clearly erroneous.

And more significantly, Sommer did not object to the court's remarks. One cannot know of improper judicial conduct, gamble on a favorable result as to that conduct, and then complain that he or she guessed wrong and does not like the outcome. *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998). If Sommer believed that the trial judge's conduct was improper, it was incumbent upon Sommer to move for recusal or mistrial at the time of the alleged misconduct—or, since trial had not yet begun, at least ask for a new venire. He did not do so then, so he is precluded from demanding a new trial now.

The district court did not clearly err in crediting the State's race-neutral explanation for its use of a peremptory strike on juror No. 66, and we reject Sommer's claim that the court erred in commenting on the defendants' prima facie showing of purposeful discrimination. The defendants' assignments of error with respect to the overruling of their *Batson* challenge are without merit.

### 2. "Jailhouse Informer" Statute

#### (a) Background

On March 15, 2005, both of the defendants joined in a motion to exclude Haukaas' testimony, pursuant to Neb. Rev. Stat. § 29-1929 (Cum. Supp. 2006). The defense took the position that Haukaas was a "jailhouse informer" within the meaning of the statute and that the State had not met the 10-day statutory notice requirement. More precisely, the defendants argued that although the State had notified them 11 days prior to trial that Haukaas would testify pursuant to a plea agreement that had not yet been memorialized, the defendants had not been notified of the specific terms of the State's offer. However, at Haukaas' deposition, Gutierrez' counsel had received actual notice of the terms of the offer from Haukaas. The district court overruled the defendants' motion. At trial, Haukaas explained that he had been charged with two first degree murders, attempted first degree

murder, robbery, and two weapons charges. In exchange for his testimony, the charges against Haukaas were to be reduced to a second degree murder charge and a weapons charge.

(b) Analysis

Neb. Rev. Stat. § 29-1928 (Cum. Supp. 2006) defines a "jailhouse informer" as "a person in custody as: An accused defendant, a convicted defendant awaiting sentencing, a convicted defendant serving a sentence, or a criminal suspect." The parties do not dispute that Haukaas was a jailhouse informer within the meaning of the statute. Section 29-1929 provides:

> Before the testimony of a jailhouse informer is admissible in court, the following requirements must be met:

> At least ten days before trial, the state shall disclose to the person against whom the jailhouse informer will testify, or to such person's counsel:

> (1) The known criminal history of the jailhouse informer;

> (2) Any deal, promise, inducement, or benefit that the state or any person acting on behalf of the state has made or may make in the future to the jailhouse informer;

> (3) The specific statements allegedly made by the person against whom the jailhouse informer will testify and the time, place, and manner of disclosure;

> (4) All cases known to the state in which the jailhouse informer testified or offered statements against a person but was not called as a witness, whether or not the statements were admitted as evidence in the case, and whether the jailhouse informer received any deal, promise, inducement, or benefit in exchange for or subsequent to such testimony or statement; and

> (5) Whether at any time the jailhouse informer recanted testimony or statements and, if so, a transcript or copy of such recantation.

The dispute in these cases arises from the requirement of § 29-1929(2) that at least 10 days before trial, the State should disclose "[a]ny deal, promise, inducement, or benefit that the state or any person acting on behalf of the state has made or may make in the future to the jailhouse informer." The defendants argue the State did not comply with this requirement.

We begin our analysis of this issue by considering the appropriate standard of review. The Legislature explained that §§ 29-1928 and 29-1929 were enacted because "the interests of justice may be thwarted by unreliable testimony at trial." § 29-1928. The Legislature further found that "the testimony of a jailhouse informer is sometimes unreliable. A jailhouse informer, due to the receipt or promise of a benefit, is presumed to provide testimony that may be unreliable." *Id.* Consequently, the Legislature determined that "[t]here is a compelling state interest in providing safeguards against the admission of testimony the reliability of which may be or has been compromised through improper inducements." *Id.*

 Those safeguards are present in § 29-1929. It is evident, from the requirements of § 29-1929, that the intent of this section is to ensure that criminal defendants have the opportunity to prepare to meaningfully confront the testimony of a jailhouse informer at trial and challenge the witness' credibility. See, also, *Dodd v. State*, 993 P.2d 778, 784 (Okla. Crim. App. 2000) (explaining that court-adopted procedure identical to § 29-1929 was intended "to ensure complete disclosure so that counsel will be prepared to cross-examine an informant-witness"). In this respect, § 29-1929 is effectively a discovery provision, insofar as "[t]he discovery process . . . provides an opportunity for pretrial preparation so that a litigant may conduct an informed cross-examination." See *Paulk v. Central Lab. Assocs.*, 262 Neb. 838, 846, 636 N.W.2d 170, 177 (2001). See, also, *State v. Eskew*, 192 Neb. 76, 218 N.W.2d 898 (1974). Exclusion of testimony based upon a failure to comply with § 29-1929 is effectively a statutory sanction for failure to comply with a discovery requirement. Compare, e.g., Neb. Rev. Stat. §§ 29-1912 and 29-1919 (Reissue 1995).

 The general rule is that trial courts have broad discretion with respect to sanctions involving discovery procedures, and their rulings thereon will not be reversed in the absence of an abuse of discretion. See *Martindale v. Weir*, 254 Neb. 517, 577 N.W.2d 287 (1998). We conclude that by extension, that standard of review is also applicable here. Therefore, we hold that a trial court's decision with respect to § 29-1929 will not be reversed in the absence of an abuse of discretion. The same

principles lead us to conclude that the district court in this case did not abuse its discretion, because the State timely notified the defendants that Haukaas would testify pursuant to a plea agreement and Gutierrez was actually notified, more than 10 days before trial, of the terms of the plea agreement.

We addressed an argument similar to the defendants' in *State v. Larsen*, 255 Neb. 532, 586 N.W.2d 641 (1998). In *Larsen*, the defendant filed a notice of intention to rely upon an insanity defense, as required by Neb. Rev. Stat. § 29-2203 (Reissue 1995). The State obtained an ex parte order requiring the defendant to undergo a mental examination. Because the State did not notify defense counsel of its request for the order, as § 29-2203 required, defense counsel was denied the opportunity to be present at the examination. On that basis, the defendant moved for exclusion of the expert witness evidence. *Larsen, supra.*

However, we rejected the defendant's argument, finding that defense counsel's effective exclusion from the examination was not prejudicial. Citing § 29-1912, we explained that whether a prosecutor's late disclosure of evidence results in prejudice depends on whether the information sought is material to the preparation of the defense, meaning that there is a strong indication that such information will play an important role in uncovering admissible evidence, aiding preparation of witnesses, corroborating testimony, or assisting impeachment or rebuttal. *Larsen, supra.* While recognizing that the circumstances placed a "heavy burden" on defense counsel, we determined that because the defendant was provided with the opportunity to depose the witness prior to his testimony, the defendant had not been prejudiced. *Id.* at 545, 586 N.W.2d at 651. Thus, we concluded the trial court had not abused its discretion by overruling the defendant's motion to exclude the expert witness testimony. *Id.*

The defendants' objections in these cases are even less compelling than the argument made in *Larsen*. Here, the record affirmatively demonstrates that the defendants were not prejudiced by the fact that the State did not inform the defendants of the terms of Haukaas' plea agreement more than 10 days prior to trial. The State did inform the defendants, by letter dated March 4, 2005, that although it had "not finalized any deal, promise inducement or benefit in exchange for [Haukaas'] testimony,"

the State did "expect to have a written agreement with . . . Haukaas prior to March 10th, 2005," and would "transmit that agreement to you as soon as it is completed." Gutierrez, through Haukaas' deposition, had actual knowledge of the terms of the State's offer.

Nor did the defendants move for a continuance to enable them to prepare to cross-examine Haukaas. When a continuance will cure the prejudice caused by belated disclosure of evidence, a continuance should be requested by counsel and granted by the trial court. *State v. Harris*, 263 Neb. 331, 640 N.W.2d 24 (2002). The defendants' failure to move for a continuance indicates that they were less concerned with their ability to cross-examine Haukaas than they were with attempting to preclude his testimony entirely. While this is understandable, it is not the intent of § 29-1929. So long as the defendants were meaningfully prepared to cross-examine Haukaas, they were not prejudiced by any belated disclosure.

At oral argument, Sommer's counsel contended, for the first time, that he was not present at Haukaas' deposition. Interestingly, neither of the defendants denied, at trial, having actual notice of the terms of Haukaas' plea agreement. But in any event, if the defendants felt that the notice they were given was inadequate, they should have either asked for a continuance to prepare for trial or explained how they were prejudiced in a way that a continuance could not have cured. They did neither.

Even now, the defendants have not explained how they were prejudiced by any delay in disclosing the terms of the plea agreement. Section 29-1929 permits a defendant to effectively cross-examine a jailhouse informer by requiring notice of particular data that the Legislature have deemed necessary to evaluate the jailhouse informer's credibility. The only required data that the defendants claim were missing from the State's notice were the precise terms of the State's plea offer, which Gutierrez obtained from Haukaas. Even had the defendants only learned the terms of the agreement at trial, they do not explain how more advance notice would have substantially assisted them in their impeachment of Haukaas' testimony, given the other information available to them. See *id*. And, in point of fact, our review of their cross-examination of Haukaas indicates that

they were able to make effective use of the information provided to them, including the terms of the plea agreement.

We do not condone the State's failure to timely notify the defendants of the terms of the plea offer that had apparently been tendered to Haukaas, and we do not foreclose the possibility that under other circumstances, such a lapse could give rise to reversible error. In these cases, however, the State substantially complied with the requirements of § 29-1929, and any technical noncompliance was not prejudicial to the defendants. The district court did not abuse its discretion in overruling the defendants' motion to exclude Haukaas' testimony.

### 3. DEMONSTRATIVE EXHIBIT

#### (a) Background

During its opening statement, the State displayed a demonstrative exhibit—a chart depicting the relationships among many of the people involved in the cases, including personal and business relationships. The chart is best described as a hierarchical chart of the members of the marijuana distribution organization, although it also depicts relevant personal acquaintances of some of the participants. No objection to the use of the chart during opening statements appears in the record. At trial, the jurors asked the court, in a note to the bailiff, if the chart could be left up for their reference during the trial. The defendants objected, on the basis that there was no foundation for the information in the exhibit, and later added that it was unfairly prejudicial and would be distracting to the jury.

However, the court overruled the objections. The court disagreed with the defendants' characterization of the jury, stating:

> They would have to be infantile to only be focusing on some exhibit when someone is testifying, and I don't believe that's the caliber of jury that we have. I am going to let you put this up and have it sitting there, but as a witness is testifying, if you need this for them . . . you can bring it up and have that there during the witness' testimony. After Direct Examination, it will be taken down unless the Defendants' attorneys want to use it during their Cross-Examination to point something out to the witness.

The court specifically instructed the jury that the chart was not an exhibit in the cases, and the chart was not sent to the jury room for deliberation.

## (b) Standard of Review

█ The admission of demonstrative evidence is within the discretion of the trial court, and a judgment will not be reversed on account of the admission or rejection of such evidence unless there has been a clear abuse of discretion. *Ford v. Estate of Clinton*, 265 Neb. 285, 656 N.W.2d 606 (2003). See *State v. Apker*, 204 Neb. 577, 284 N.W.2d 14 (1979).

## (c) Analysis

█ Demonstrative exhibits are admissible if they supplement a witness' spoken description of the transpired event, clarify some issue in the case, and are more probative than prejudicial. *Ford, supra.* Demonstrative exhibits are inadmissible when they do not illustrate or make clearer some issue in the case; that is, where they are irrelevant or where the exhibit's character is such that its probative value is substantially outweighed by the danger of unfair prejudice. *Id.* The defendants argue that the chart should not have been displayed during the trial, because many of the individuals represented on the chart did not testify at trial and, according to the defendants, the relationships depicted were speculative. The defendants also argue that the chart was distracting.

Our review of the record, however, finds clear support for all of the information depicted on the chart. In fact, our analysis of the evidence in these cases was helped by our own reference to the chart during our review of the record. This was a complicated trial with many witnesses and even more people and relationships to remember, and it was not unreasonable for the district court to conclude that the chart could assist the jury in understanding the evidence presented. While we question the claim that the chart would have distracted from the testimony, the court's ruling permitted the defendants to remove the chart during their examination of the witnesses, allowing the defendants to make any pertinent points without distraction, and minimizing any prejudice.

The district court's ruling demonstrates that it carefully considered the advantages and disadvantages of displaying the chart, and it did not abuse its discretion in concluding that the chart would help the jury by illustrating the evidence the State presented. The defendants' assignments of error are without merit.

### 4. Coconspirator Statements

#### (a) Background

Both of the defendants also objected to Haukaas' testimony on the basis of hearsay, arguing that Haukaas' testimony as to statements made by Sommer and Gutierrez was not admissible as coconspirator testimony because the existence of a conspiracy had not been proved before Haukaas testified. The court overruled the objections, indicating that it would determine, as the evidence was adduced, whether there was evidence of a conspiracy. The defendants now argue that the admission of this testimony was error.

#### (b) Standard of Review

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006).

#### (c) Analysis

Hearsay is not admissible except as provided by the Nebraska Evidence Rules, by other rules adopted by the statutes of the State of Nebraska, or by the discovery rules of this court. See Neb. Evid. R. 802, Neb. Rev. Stat. § 27-802 (Cum. Supp. 2006). The testimony primarily at issue here, Haukaas' testimony regarding Gutierrez' and Sommer's out-of-court statements implicating them in the killings, was admitted pursuant to Neb. Evid. R. 801(4)(b), Neb. Rev. Stat. § 27-801(4)(b) (Reissue 1995), which provides that a statement is not hearsay if it "is offered against a party and is . . . (v) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

The defendants claim that Haukaas' testimony was not admissible because *at the time the testimony was offered*, the State had not offered evidence of a conspiracy. The defendants' argument implicates two separate issues: what foundation must be laid for the admission of a coconspirator's statement and when that foundation must be laid.

In *State v. Bobo*, 198 Neb. 551, 253 N.W.2d 857 (1977), we noted the parallel between our rule 801(4)(b)(v) and Fed. R. of Evid. 801(d)(2)(E) and stated that to be admissible, the statements of the coconspirator must have been made while the conspiracy was pending and in furtherance of its objects. If the statements took place after the conspiracy had ended, or if merely narrative of past events, they are not admissible. *Bobo, supra.* In other words, for an out-of-court statement to be admissible under rule 801(4)(b)(v), there must be evidence that there was a conspiracy involving the declarant and the nonoffering party and that the statement was made during the course and in furtherance of the conspiracy. See *Bourjaily v. United States*, 483 U.S. 171, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987).

In *Bobo*, we further explained that although rule 801(4)(b)(v) is applicable regardless of whether the defendant is charged with conspiracy,

> [t]he rule is well established that before the trier of facts may consider testimony under the coconspirator exception to the hearsay rule, a prima facie case establishing the existence of the conspiracy must be shown by independent evidence. . . . The purpose of requiring that the conspiracy be established by independent evidence is to prevent the danger of hearsay evidence being lifted by its own bootstraps, i.e., relying on the hearsay statements to establish the conspiracy, and then using the conspiracy to permit the introduction of what would otherwise be hearsay testimony in evidence.

198 Neb. at 557, 253 N.W.2d at 861. Accord, *State v. Myers*, 258 Neb. 300, 603 N.W.2d 378 (1999); *State v. Hansen*, 252 Neb. 489, 562 N.W.2d 840 (1997). The defendants argue, based on *Bobo*, that foundation was lacking in the instant cases because when Haukaas took the stand, independent proof of the conspiracy had not been established.

In *State v. Copple*, 224 Neb. 672, 401 N.W.2d 141 (1987), *abrogated on other grounds, State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990), we warned trial courts about the perils of admitting coconspirator evidence conditioned on later evidence of a conspiracy. We held that the evidence of conspiracy required by the rules of evidence could be established by evidence presented to the jury as substantive evidence of the crimes charged. But we cautioned that

> [a]dmission of evidence from a coconspirator, subject to the State's later completing proof of a prima facie case of conspiracy, presents some procedural problems which may result in unwarranted, or even unfair, prejudice to a defendant, for example, the necessity of a motion to strike evidence conditionally received, a request to withdraw the coconspirator's testimony from consideration by the jury, or an instruction that the jury shall disregard the evidence which has been presented but not linked to a conspiracy. Whatever procedure might seem most appropriate on failure of proof after a conditional admission of evidence, there is an ever-present risk that the court's later instruction may not erase a prejudicial impression on the jury — with the specter of a mistrial.

*Id.* at 694-95, 401 N.W.2d at 157.

That having been said, there is some question whether the preference we expressed in *Copple* rises to the bright-line requirement urged upon us by the defendants. See, *Hansen, supra*; *State v. Conn*, 12 Neb. App. 635, 685 N.W.2d 357 (2004). But we do not confront that issue here because of a more fundamental problem in the defendants' argument.

 The defendants' argument is based on the mistaken premise that evidence of a conspiracy was necessary before *any* of Haukaas' testimony was admissible. In fact, rule 801(4)(b)(v) governs only the admissibility of testimony about out-of-court statements made by a coconspirator—not the admissibility of all the other testimony offered by the same witness. Rule 801(4)(b)(v) is simply irrelevant to the direct testimony of a coconspirator. See *United States v. Smith*, 692 F.2d 693 (10th Cir. 1982). See, also, *Laughlin v. United States*, 385 F.2d 287 (D.C. Cir. 1967). There is no reason why a witness cannot testify

to the existence of a conspiracy, and that the defendant was a participant, and then testify to out-of-court statements made by the alleged coconspirators.

Here, Haukaas testified about statements made to him by Gutierrez and Sommer that were admitted as nonhearsay coconspirator statements. But before any of that testimony, Haukaas explained, based on personal knowledge, how he, Gutierrez, and Sommer were involved in a conspiracy to distribute marijuana. The statements made by Sommer and Gutierrez, to which Haukaas testified, were made in furtherance of that conspiracy. The State was not required to prove the existence of the conspiracy before Haukaas took the witness stand, and nothing in the Nebraska Evidence Rules barred Haukaas, as a witness, from testifying about the conspiracy and providing the foundation for admission of the coconspirator statements Haukaas attributed to Gutierrez and Sommer. Haukaas' testimony established prima facie evidence of a conspiracy before he testified to the statements of Gutierrez and Sommer.

 Gutierrez' argument is limited to Haukaas' testimony and is disposed of by that conclusion. Sommer also directs the same legal argument at testimony from Bowen, Lucero, and King. The record reveals no more than general hearsay objections to the testimony of Bowen and Lucero, and no hearsay objection at all to King's testimony. Unless an objection to offered evidence is sufficiently specific to enlighten the trial court and enable it to pass upon the sufficiency of such objection and to observe the alleged harmful bearing of the evidence from the standpoint of the objector, no question can be presented therefrom on appeal. *State v. Hall*, 270 Neb. 669, 708 N.W.2d 209 (2005). But in any event, our reasoning above with respect to Haukaas' testimony is also dispositive of Sommer's argument with respect to other witnesses.

Finally, Sommer argues that the statements allegedly made by Gutierrez were not made in furtherance of the conspiracy, as required for admissibility under rule 801(4)(b)(v). Assuming that Sommer's general hearsay objections were sufficient to preserve the issue for appellate review, Sommer's argument presents no basis for reversal.

The two statements at which Sommer's argument is directed are (1) Gutierrez' statements to King at King's apartment and (2) a statement that Haukaas testified Gutierrez made to him, after they were both in jail, in which Gutierrez asked Haukaas why Haukaas "told" on Gutierrez. Gutierrez' statement to King, a participant in the marijuana distribution operation, was part of a conversation initiated by Gutierrez while seeking refuge in King's apartment from the police. It is well established that the "in furtherance" language of rule 801 is to be construed broadly. See, e.g., *U.S. v. Phillips*, 219 F.3d 404 (5th Cir. 2000); *U.S. v. Garcia*, 893 F.2d 188 (8th Cir. 1990). It is also well established that statements made by a coconspirator in furtherance of avoiding capture or punishment are made in furtherance of the conspiracy within the meaning of rule 801. See, e.g., *U.S. v. Triplett*, 922 F.2d 1174 (5th Cir. 1991); *Garcia, supra*; *United States v. Sears*, 663 F.2d 896 (9th Cir. 1981). Gutierrez' alleged statement to King falls into that category.

As for Gutierrez' alleged statement to Haukaas in jail, it does not implicate Sommer in any way, and its admission as to Sommer was at worst harmless error. Evidentiary error is harmless when improper admission of evidence did not materially influence the jury to reach a verdict adverse to substantial rights of the defendant. *State v. Myers*, 258 Neb. 300, 603 N.W.2d 378 (1999). Harmless error review looks to the basis on which the jury actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *State v. Iromuanya, ante* p. 178, 719 N.W.2d 263 (2006).

A coconspirator's idle chatter or casual conversation about past events is generally not considered to be in furtherance of the conspiracy for rule 801 purposes. See, *U.S. v. Shores*, 33 F.3d 438 (4th Cir. 1994); *United States v. Phillips*, 664 F.2d 971 (5th Cir. 1981). But this was a single comment, made during a long trial, that was directly inculpatory only to the declarant, Gutierrez, and not to Sommer. Compare, e.g., *United States v. Schepp*, 746 F.2d 406 (8th Cir. 1984); *United States v. Mackey*, 571 F.2d 376 (7th Cir. 1978). We also note

that the statement was clearly admissible as to Gutierrez and Sommer did not request a limiting instruction regarding the jury's use of the testimony.

Based on a thorough review of the record, we conclude that Sommer's conviction was unattributable to the error. In the absence of a request for a limiting instruction, or any prejudice to Sommer from the admission of the statement, we find no reversible error in the district court's decision to permit the testimony.

For the foregoing reasons, we reject the defendants' assignments of error with respect to coconspirator statements.

### 5. SUPPLEMENTAL INSTRUCTIONS

#### (a) Background

The day after the cases were submitted to the jury, the jury asked the court to define "abets and procures." The precise context for this question is not apparent, since the actual jury instructions do not appear in the record. The court held a telephonic conference with counsel and proposed to instruct the jury as follows: "In response to your question regarding the definition of abets and procures, Nebraska law provides as follows: one who incites or instigates the commission of a felony when he's neither actually nor constructively present is an aider, abettor, or procurer." The State agreed, but the defendants objected. The court stated:

> I am looking at instruction number 16 right now, which is our definition instruction. It starts off with deliberate and then it defines malice, premeditated, purposely, firearm, and so forth, but I do note for the record that there isn't a definition or an explanation of abets or procures and I agree with the State. I believe that those are words when used in a legal context that if the jury requests it, that I should provide them with some type of guidance. So I am going to note your objection, but I am going to overrule it and I am going to respond.

The court replied to the jury as set forth above.

The same morning, the jury asked, "if we don't believe that the victim was the intended victim, can first-degree murder apply?" The court proposed the following answer:

> I am unable to answer your question. The Court does, however, provide you with a supplemental instruction, where

one attempts to kill a certain person, but by mistake or inadvertence kills a different person, the crime, if any, so committed is the same as though the person originally intended to be killed, had been killed.

Again, the State agreed but the defendants objected. The court determined that "this is a case where the doctrine of transferred intent applies and the jury was not instructed on that originally and actually I should have included this in the original set of instructions, and so I am going to give that instruction to them now."

### (b) Standard of Review

Whether a jury instruction is correct is a question of law, regarding which an appellate court is obligated to reach a conclusion independent of the determination reached by the trial court. *State v. Grosshans*, 270 Neb. 660, 707 N.W.2d 405 (2005). However, the decision whether to reply to questions from the jury regarding the applicable law is entrusted to the discretion of the trial court. See *State v. Neujahr*, 248 Neb. 965, 540 N.W.2d 566 (1995).

### (c) Analysis

Both of the defendants assign error to the district court's supplemental instructions. Gutierrez argues, first, that the district court erred in issuing instructions to the jury neither in open court nor in the presence of the parties and counsel. As pertinent, Neb. Rev. Stat. § 25-1116 (Reissue 1995) provides that "[a]fter the jury have retired for deliberation . . . if they desire to be informed as to any part of the law arising in the case, they may request the officer to conduct them to the court where the information upon the point of law shall be given . . . ." We have stated that if it becomes necessary to give further instructions to the jury during deliberation, the proper practice is to call the jury into open court and to give any additional instructions in writing in the presence of the parties or their counsel. *State v. Jackson*, 264 Neb. 420, 648 N.W.2d 282 (2002).

However, counsel in this case was informed by telephonic hearing of each of the jury's questions, and while they objected to the instructions, they did not object to the procedure. The failure to make a timely objection waives the right to assert

prejudicial error on appeal. *State v. Anderson*, 269 Neb. 365, 693 N.W.2d 267 (2005). Furthermore, Gutierrez has not shown how he was prejudiced by the court's procedure. Counsel was informed of the jury's questions, informed of the court's proposed reply, and given the opportunity to object. "Although communication between the trial judge and jurors should always take place with the parties and their counsel present (unless waived), the record before us does not affirmatively show that the communications in this case resulted in prejudice." See *Jackson*, 264 Neb. at 431, 648 N.W.2d at 291-92.

Sommer argues that the second supplemental instruction, on transferred intent, was prejudicial. Sommer claims that the supplemental instruction "allowed the jurors to improperly consider a felony murder type of instruction where specific intent is not required as it is in first degree murder." Brief for appellant Sommer at 76.

 However, in an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006). All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *Id.*

Although Sommer seems to suggest otherwise, there is little question that as a general proposition, the court's supplemental instruction correctly stated the law with respect to transferred intent. See *State v. Iromuanya, ante* p. 178, 719 N.W.2d 263 (2006). There is also little question that the doctrine of transferred intent, as described, is pertinent to this case, given the evidence suggesting that Lucero was the defendants' real target.

That having been said, it is difficult for us to evaluate whether the supplemental instruction was prejudicial, because the record does not contain the instructions given to the jury prior to submission of the case. It is impossible to read the instructions together, as a whole, when the whole of the instructions is not present. In the absence of the other instructions, since the supplemental instruction standing alone is a correct statement of

law and is pertinent to the issues presented in the case, we conclude that Sommer has failed to demonstrate that he was prejudiced by the court's supplemental instruction.

Neither of the defendants has shown how he was prejudiced by the court's supplemental instructions, either in substance or in the procedure by which the supplemental instructions were given. We find no merit in the defendants' assignments of error.

## 6. INCOMPLETE DISCOVERY

### (a) Background

On cross-examination of Kanger, Gutierrez asked about several police reports detailing Kanger's contact with persons related to the investigation. In response to a State objection, Gutierrez' counsel explained that he was just trying to make sure he had all of the police reports relevant to the case. The State indicated that "[e]verything that we have has been turned over" but that defense counsel could examine the State's index to make sure that nothing had been missed.

On the next day of trial, after the midday recess, the State made the following statement for the record:

> I would like to put one quick thing on the record if I might. I want to make sure that the record is very clear in terms of any — it seems like on a daily basis we have discovery issues that are arising. I want the record to be very clear[.] I am prepared — if there is anything that either defense attorney needs or believes they don't have, I will be — witness addresses, anything, we are available to provide that to them. It's my understanding they do have everything, but I certainly don't want anyone to think they can't ask us or let us know if there's something they feel they don't have. I just don't want the record to continually reflect discovery issues 'cause I think that's problematic. I think we have given everything . . . . We remain ready to turn over anything they think they don't have.

Both defense attorneys indicated their understanding.

After that statement, the State directly examined Bowen, and the court recessed for the day before cross-examination. The next morning, Gutierrez' counsel said that he was missing several police reports. Counsel explained that after Bowen's testimony,

he found that there were reports relevant to Bowen that he did not have. Counsel said that he had obtained those reports at 10 o'clock the previous evening, and they pertained to Bowen and the other witnesses scheduled to be called during that day. The State explained that it believed everything had been provided to all of the defendants, but also indicated that at that point, because the State had only a "bulk receipt," it could not prove what Gutierrez' counsel had been provided and what he had not. The State declined to engage in a "he said, she said" debate, but explained that it had an "open-file" policy, and had provided the defendants both with records and the opportunity to review the State's records to ensure complete discovery.

The court stated that it had "some trouble believing" that of the six sets of copies that had been made of the discovery materials, only Gutierrez' set was missing the disputed police reports. The court initially denied a continuance, but offered a "few minutes" to look over the reports. The State, however, asked the court to give Gutierrez' counsel more time to review the reports.

Ultimately, although Gutierrez made a motion for mistrial, Gutierrez' counsel indicated that he would require "a couple of hours" to read the reports relating to Bowen and prepare for cross-examination. The court said that Gutierrez had no grounds for a mistrial and recessed for the morning to give counsel the opportunity to review the discovery material. The State then agreed to defer its other witnesses referenced in the disputed discovery material until the following Monday morning. The dispute had arisen on a Friday morning, and the State agreed to give Gutierrez' counsel the weekend to review the discovered material. Gutierrez accepted this concession, but preserved his motion for mistrial.

The police reports that Gutierrez claimed had not been provided to him were entered into the record as exhibit 200. This court has examined exhibit 200, as part of its review of the record. Exhibit 200 contains 533 pages of police records, discounting some police reports that were duplicated. A substantial majority of that material, 369 pages, are exhaustive records of the investigation of the crime, describing such matters as: inventories from search warrants, impounded vehicles, and evidence collection at the crime scene and hospital; documentation of

forensic analyses, laboratory tests, photographs, and recordings of interviews; and the canvassing of the neighborhood in which the killings took place. The transcripts of 911 calls reporting the crime occupy 19 pages, and the police report describing the interview of Carranza is 16 pages long. Another 35 pages are devoted to the pursuit and apprehension of Gutierrez, Sommer, and Mace, and the largely fruitless interviews with them after their apprehension.

The police report of an interview with Kip Kelly is another 17 pages long. What remains are 77 pages of police reports, describing interviews with Bowen, Lucero, Romero, and King. Broadly characterized, those interviews reveal no glaring inconsistency with the testimony of those witnesses at trial, except that some of the witnesses, particularly Bowen, were initially reluctant to volunteer the extent of their involvement in marijuana distribution. It should be noted that Bowen's initial prevarication to police was thoroughly explored on cross-examination by the defendants, as were other inconsistencies between witnesses' trial testimony and their initial statements to police.

### (b) Standard of Review

The decision whether to grant a motion for mistrial is within the discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion. *State v. Mason*, 271 Neb. 16, 709 N.W.2d 638 (2006).

### (c) Analysis

Gutierrez claims that the district court erred in overruling his request for a continuance and motion for mistrial based on the allegedly omitted police reports. But, as set forth above, Gutierrez' counsel was given the time he said he would need to review the material relevant to Bowen and was given additional time to review the remaining material. Thus, the issue on appeal is really whether a mistrial was warranted. We assume without deciding, for purposes of this analysis, that the State was under a duty to provide Gutierrez with the disputed reports and that those reports were not actually provided to Gutierrez. As previously noted, pursuant to § 29-1912, upon a defendant's proper request through discovery procedure, the State must disclose information which is material to the preparation of a defense to

the charge against the defendant. *State v. Harris*, 263 Neb. 331, 640 N.W.2d 24 (2002). In order that the defendant receive a fair trial, requested and material information must be disclosed to the defendant. *Id.*

In support of his argument, Gutierrez cites the U.S. Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and this court's decision in *State v. Castor*, 257 Neb. 572, 599 N.W.2d 201 (1999). But there is a critical distinction between those cases and the instant case, which is that in *Brady* and *Castor*, the prosecution failed to disclose exculpatory information until after the defendant in each case had been convicted. This is not such a case. Instead, the issue here is whether Gutierrez was prejudiced by the State's alleged failure to make a timely disclosure. Despite relying on *Brady* and *Castor*, Gutierrez concedes that he was eventually provided with the reports about which he is now complaining. The real question in this case is whether Gutierrez was irreparably harmed by the belated disclosure.

Before it is necessary to grant a mistrial for prosecutorial misconduct, the defendant must show that a substantial miscarriage of justice has actually occurred. *Harris, supra.* When a continuance will cure the prejudice caused by belated disclosure of evidence, a continuance should be requested by counsel and granted by the trial court. *Id.* Gutierrez has not explained, in this case, why the continuance that was granted was insufficient to cure any prejudice resulting from the allegedly belated disclosures. In the absence of such an explanation, it is difficult to conclude that the court abused its discretion in denying Gutierrez' motion for a mistrial.

Furthermore, Gutierrez does not explain, even in his appellate brief, how he was prejudiced by the State's alleged failure to disclose information. Gutierrez simply asserts, in the most general terms, that counsel did not have adequate time to investigate and review the information prior to trial. Yet in his appellate brief, he does not identify any specific way in which he was prejudiced. Compare *State v. Gales*, 269 Neb. 443, 694 N.W.2d 124 (2005). The disputed reports primarily dealt with the collection and examination of physical evidence, which was not the subject of much controversy in this case. The police reports

about interviews with witnesses are, in our view, largely consistent with the trial testimony. No promising lines of inquiry or investigation made themselves apparent in our review, and more to the point, Gutierrez has not called them to our attention. Compare *State v. Kula*, 252 Neb. 471, 562 N.W.2d 717 (1997). Gutierrez does not specifically identify any facts contained in the police reports that were pertinent to the case but unknown to him, nor does he explain what he might have found, given additional time, that would have been material.

Instead, the closest we have here to an explanation of what might have been found in the police reports is counsel's assertion, at oral argument, that on cross-examination at trial, he would have more thoroughly inquired into Bowen's relationship with Lucero. Counsel specifically mentioned that there was a reference, in the police reports, to Lucero's contacting Bowen after the falling out with Gutierrez in an attempt to maintain the marijuana business.

But it is not clear, from Gutierrez' argument or our own review of the record, what part of exhibit 200 would have provided more of a basis for that inquiry than what Gutierrez would have been able to learn during the continuance he was given to examine the 59 pages of reports relating to Lucero's and Bowen's interviews. The only pertinent reference in the police reports is Bowen's statement, in an interview conducted well after the killings, that Lucero had spoken to him in jail after they were both incarcerated on drug charges. The utility and import of this fact is neither apparent nor explained by Gutierrez.

In short, Gutierrez has not explained how the continuance that he was afforded was insufficient to allow him to prepare to resume trial. The fact that no prejudice has been explained lends support to our determination that the district court did not abuse its discretion in denying Gutierrez' motion for mistrial.

### 7. *Daubert* Objection

#### (a) Background

Before the State adduced testimony relating to the use of cellular telephones, the defendants objected and requested a *Daubert* hearing on the admissibility of that evidence. See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579,

113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Both of the defendants later objected to the admission of telephone records from Sprint Telecommunications, on the basis of relevance. Generally, the defendants argued that because there was cell tower location information contained in the records, the jury might infer that particular telephone calls were made from particular areas. The district court overruled the objection.

The State adduced testimony that although the precise location of an individual could not be determined through cellular telephone records, the location of the tower through which a call is placed does establish that the person using the telephone is somewhere within the general "zero- to three-mile range" of the tower.

As we previously noted, telephone records were used to corroborate Haukaas' testimony and establish that a telephone call was made to Lucero's telephone from a pay telephone at 60th and Grover Streets at around the time Haukaas claimed that Sommer made such a call. More pertinently, the Sprint Telecommunications telephone records objected to by Sommer also show that around the time of the pay telephone call, two cellular telephone calls were made from Sommer's cellular telephone to Gutierrez' telephone and were connected through a cell tower at 71st Street and West Center Road, a little over a mile from 60th and Grover Streets.

### (b) Standard of Review

 An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion. *State v. Jackson*, 264 Neb. 420, 648 N.W.2d 282 (2002). The exercise of judicial discretion is implicit in determinations of relevancy under Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1995), and prejudice under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1995), and a trial court's decision regarding them will not be reversed absent an abuse of discretion. *State v. Iromuanya, ante* p. 178, 719 N.W.2d 263 (2006).

### (c) Analysis

 Sommer first contends that the telephone records at issue should have been excluded pursuant to *Daubert, supra.*

An expert's opinion is ordinarily admissible under Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 1995), if the witness (1) qualifies as an expert, (2) has an opinion that will assist the trier of fact, (3) states his or her opinion, and (4) is prepared to disclose the basis of that opinion on cross-examination. *State v. Robinson, ante* p. 582, 724 N.W.2d 35 (2006). When the opinion involves scientific or specialized knowledge, this court held in *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), that we will apply the principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). See *Robinson, supra*. Under the *Daubert/Schafersman* jurisprudence, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion. This gatekeeping function entails a preliminary assessment whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Id.*

But in *Robinson, supra*, we recently rejected an argument effectively identical to Sommer's. In *Robinson*, the defendant similarly raised a *Daubert* objection to cellular telephone records. We rejected that argument, explaining that

> *Daubert* does not create a special analysis for answering questions about the admissibility of all expert testimony. . . . Not every attack on expert testimony amounts to a *Daubert* claim. . . . Here, the defendant's purported *Daubert* claim is suspect because the defendant's *Daubert* objection was made, not to expert opinion testimony, but to business records evidencing historical facts. Moreover, even if the objection is extended to the testimony based upon those records, the testimony given was not expert opinion testimony.

*Robinson, ante* at 618, 724 N.W.2d at 68, citing *City of Lincoln v. Realty Trust Group*, 270 Neb. 587, 705 N.W.2d 432 (2005). We concluded that *Daubert* was not pertinent to the records objected to in that case, because *Daubert* applies to expert opinion testimony and the records at issue in that case "contained nothing resembling 'expert opinion testimony,' since they did not refer to an expert, an opinion, or any testimony." *Robinson, ante* at 619, 724 N.W.2d at 69.

The same is true in this case. The telephone records to which Sommer objected did not represent expert opinion testimony. The testimony presented by the telephone company employee through whom the records were admitted was not opinion testimony, but instead foundational testimony explaining the data in the records. Any question about the foundation for the cellular location data contained in the records would properly have been framed under the business records exception to the hearsay rule, not *Daubert*. See, *id.*; Neb. Evid. R. 803(5), Neb. Rev. Stat. § 27-803(5) (Cum. Supp. 2006).

Sommer's tour of the Nebraska Evidence Rules also makes a stop at rule 401. Under rule 401, relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Evidence which is not relevant is not admissible. Neb. Evid. R. 402, Neb. Rev. Stat. § 27-402 (Reissue 1995). As we understand Sommer's argument, it is that the telephone records were not relevant because the data could not precisely place the telephone in a particular location when it was used.

But although the records could not place the telephone in an exact location, the foundation established at trial indicated that the records could place Sommer's telephone in the general vicinity of 60th and Grover Streets at the time Haukaas testified they were there and that Sommer's telephone was used to call Gutierrez. This was relevant evidence because it corroborated Haukaas' testimony about the sequence of events leading to the killing. While it was possible for the telephone records to be imprecise, that possibility was testified to at trial by the witness who laid foundation for the telephone records, was explored on cross-examination, and was discussed in Sommer's closing argument. The challenge made by Sommer went to the weight of the evidence, not to its admissibility. See *State v. Tolliver*, 268 Neb. 920, 689 N.W.2d 567 (2004).

In his appellate brief, Sommer also suggests that the telephone records should have been excluded under rule 403. It is unclear from the record whether Sommer made a rule 403 objection at trial, although the basic premise of his rule 403 argument is the same as his rule 401 argument. Under rule 403,

evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *State v. Canbaz*, 259 Neb. 583, 611 N.W.2d 395 (2000). Sommer argues that "[t]he concern from [Sommer's] standpoint was that the jury would look at those records, derive the location of the cellular phone tower from those records and inappropriately conclude that the cell tower information was showing the vicinity from where the call was made." Brief for appellant Sommer at 68.

But, had the jury done so, it would have been a determination supported by the testimony presented at trial. As previously noted, the evidence established the approximate range of the cell sites through which cellular telephone calls are placed, and established the site through which Sommer's telephone placed calls on the night of the killings. That evidence was attacked by Sommer on cross-examination and in closing argument. The evidence may have been prejudicial to Sommer, but only evidence tending to suggest a decision on an *improper* basis is *unfairly* prejudicial. *State v. Lee*, 247 Neb. 83, 525 N.W.2d 179 (1994). The telephone records in this case did not suggest a decision on an improper basis.

In sum, we conclude that the court did not abuse its discretion in permitting the Sprint Telecommunications telephone records into evidence. Sommer's assignment of error is without merit.

### 8. SUFFICIENCY OF EVIDENCE

#### (a) Standard of Review

In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Aldaco*, 271 Neb. 160, 710 N.W.2d 101 (2006). When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

(b) Analysis

Both of the defendants question the sufficiency of the evidence to support their convictions. The defendants challenge the credibility of the State's witnesses and the quality of the police investigation of the crime. The defendants contend that their witnesses were more credible; that Lucero, Haukaas, and King all had motive to have Lopez killed; and that the police failed to fully consider other suspects. The defendants note that most of the State's key witnesses were convicted drug traffickers testifying pursuant to plea agreements and call our attention to facts in the record that, according to the defendants, are inconsistent with the State's theory of the cases and raise suspicion about whether someone else was actually responsible for the killings.

 But those arguments are not persuasive in light of our standard of review. In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *State v. Cook*, 266 Neb. 465, 667 N.W.2d 201 (2003). The defendants may not think the jury should have believed the testimony of Lucero, Haukaas, and King, but a conviction may be based upon the uncorroborated testimony of an accomplice. See *State v. Sims*, 258 Neb. 357, 603 N.W.2d 431 (1999). While there was conflicting testimony in this lengthy trial, the evidence was certainly sufficient to support the jury's determination that the defendants were guilty of the crimes charged. We find no merit to the defendants' assignments of error.

9. CUMULATIVE ERROR

Both of the defendants contend that the cumulative effect of the other errors they assigned deprived them of a fair trial. While any one of several errors may not, in and of itself, warrant a reversal, if all of the errors in the aggregate establish that the defendant did not receive a fair trial, a new trial must be granted. *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998). The question, then, is whether in the aggregate the claimed

errors denied the defendants a fair trial. See *State v. Kern*, 224 Neb. 177, 397 N.W.2d 23 (1986). Having rejected each of the defendants' assignments of error to this point, we also conclude that the defendants were not denied a fair trial, and we reject the defendants' final assignments of error.

## V. CONCLUSION

None of the defendants' assignments of error merit reversal. We find the evidence sufficient to sustain the convictions and reject the defendants' claim to have been denied a fair trial by cumulative error. Therefore, we affirm the convictions and sentences entered by the district court.

AFFIRMED.

HEAVICAN, C.J., not participating.