Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/07/2016 12:10 PM CDT

State of Nebraska, appellee, v.
Candice M. McMillion, appellant.
___ N.W.2d ___

Filed March 1, 2016.    No. A-14-1166.

1. **Witnesses: Testimony: Evidence.** If a witness uses a writing to refresh his or her memory for the purpose of testifying, either before or while testifying, an adverse party is entitled to have it produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce into evidence those portions which relate to the testimony of the witness.
2. **Criminal Law: Mental Health: Minors.** No professional counselor-patient privilege exists in criminal prosecutions for injuries to children.
3. ____: ____: ____. The statutory privilege between patient and professional counselor is not available in a prosecution for child abuse.
4. **Appeal and Error.** An error is harmless when no substantial miscarriage of justice occurred as a result of the error.
5. **Criminal Law: Trial: Courts: Appeal and Error: Words and Phrases.** Harmless error exists in a bench trial of a criminal case when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the court in a judgment adverse to a substantial right of the defendant.
6. **Constitutional Law: Pretrial Procedure.** Confrontation Clause rights are trial rights that do not extend to pretrial hearings in state proceedings.
7. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.
8. **Constitutional Law: Search and Seizure: Standing.** A "standing" analysis in the context of search and seizure is nothing more than an

inquiry into whether the disputed search and seizure has infringed an interest of the defendant in violation of the protection afforded by the Fourth Amendment.

9. **Constitutional Law: Search and Seizure.** The test used to determine if a defendant has an interest protected by the Fourth Amendment is whether the defendant has a legitimate or justifiable expectation of privacy in the premises.

10. \_\_\_\_: \_\_\_\_. Two inquiries are required to determine if a defendant has a legitimate expectation of privacy in the premises. First, an individual must have exhibited an actual (subjective) expectation of privacy, and second, the expectation must be one that society is prepared to recognize as reasonable.

11. \_\_\_\_: \_\_\_\_. In the context of search and seizure, with regard to the content of cell phones, an accused must first establish that he personally has a legitimate expectation of privacy in the object that was searched.

12. **Constitutional Law: Search and Seizure: Proof.** An individual may demonstrate infringement of his or her own legitimate expectation of privacy by showing that he owned the premises or that he occupied them and had dominion and control over them based on permission from the owner.

13. **Constitutional Law: Search and Seizure: Words and Phrases.** Factors relevant to the determination of standing in the context of search and seizure include historical use of the property or item, ability to regulate access, the totality of the circumstances surrounding the search, the existence or nonexistence of a subjective anticipation of privacy, and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

14. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

15. **Criminal Law: Public Officers and Employees: Attorney and Client.** A public defender's duty is to represent all indigent felony defendants.

16. **Constitutional Law: Criminal Law: Right to Counsel.** An indigent criminal defendant's Sixth Amendment right to counsel does not include the right to counsel of the indigent defendant's own choice.

17. **Constitutional Law: Right to Counsel: Conflict of Interest.** A Sixth Amendment right to effective assistance of counsel includes representation free of conflicts of interest which adversely affect the lawyer's performance.

18. **Right to Counsel: Conflict of Interest: Appeal and Error.** Whether a defendant's lawyer's representation violates a defendant's right to representation free from conflicts of interest is a mixed question of

law and fact that an appellate court reviews independently of the lower court's decision.

19. **Attorney and Client: Conflict of Interest.** The fact that an attorney has other clients, including one who would be a State witness and testify at trial, is not sufficient in and of itself to constitute a conflict of interest.

20. **Effectiveness of Counsel: Conflict of Interest: Words and Phrases.** The phrase "conflict of interest" denotes a situation in which regard for one duty tends to lead to disregard for another or where a lawyer's representation of one client is rendered less effective by reason of his or her representation of another client.

21. **Effectiveness of Counsel: Conflict of Interest: Proof.** A defendant who shows that a conflict of interest actually affected the adequacy of his or her representation need not demonstrate prejudice, but such conflict of interest must be shown to have resulted in conduct by counsel that was detrimental to the defense.

22. **Attorney and Client: Conflict of Interest.** Where no direct or concurrent representation is involved, there is no actual conflict of interest.

23. **Attorney and Client: Conflict of Interest: Informed Consent.** A lawyer who formerly represented a client in a matter is prohibited from thereafter representing another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

24. **Juries.** A jury must be sequestered when a case is finally submitted to the jury.

25. **Criminal Law: Trial: Juries: Appeal and Error.** Whether a jury is to be kept together before submission of the cause in a criminal trial is left to the discretion of the trial court.

26. ____: ____: ____: ____. To warrant reversal, denial of a motion to sequester the jury before submission of the cause must be shown to have prejudiced the defendant.

27. **Motions for Mistrial: Appeal and Error.** Whether to grant a mistrial is within the trial court's discretion, and an appellate court will not disturb its ruling unless the court abused its discretion.

28. **Prosecuting Attorneys: Trial.** Prosecutors are charged with the duty of conducting criminal trials in such a manner that an accused may have a fair trial.

29. **Constitutional Law: Prosecuting Attorneys: Trial.** A prosecutor's comment on a defendant's silence in the defendant's trial is a violation of an accused's right to remain silent under the 5th and 14th Amendments to the U.S. Constitution and under article I, § 12, of the Nebraska Constitution.

30. ____: ____: ____. The prohibition against a prosecutor's comment on a defendant's right to remain silent applies throughout a trial, including the opening statement and closing argument during the defendant's trial.

31. ____: ____: ____. In an opening statement for a jury trial, a prosecutor's comment concerning the necessity of the defendant's testimony or an expression concerning the plausibility or credibility of anticipated testimony from a defendant violates an accused's right to remain silent at trial.

32. **Motions for Mistrial: Prosecuting Attorneys: Proof.** Before it is necessary to grant a mistrial for prosecutorial misconduct, the defendant must show that a substantial miscarriage of justice has actually occurred.

33. **Trial: Parties.** A party is allowed considerable latitude in making an opening statement.

34. **Trial: Prejudicial Statements.** The impact of any comment made at trial depends on the atmosphere at trial.

35. **Motions for Mistrial: Prejudicial Statements: Appeal and Error.** In ruling on a motion for mistrial, the trial judge is in a better position to measure the impact a comment has on a jury, and his or her decision will not be overturned unless clearly erroneous.

36. **Trial: Evidence.** In an opening statement, it is permissible for the State to discuss what the evidence may show.

37. **Appeal and Error.** Errors that are assigned but not argued will not be addressed by an appellate court.

38. **Trial: Jurors.** Both when determining whether a venireperson should be removed for cause and when determining whether a juror should be retained after the commencement of trial, the retention or rejection of a juror is a matter of discretion for the trial court.

39. **Criminal Law: Jury Misconduct: Proof.** In a criminal case, jury misconduct must be demonstrated by clear and convincing evidence.

40. ____: ____: ____. Where the jury misconduct in a criminal case involves juror behavior only, the burden to establish prejudice rests on the party claiming the misconduct.

41. **Trial: Evidence: Appeal and Error.** On appeal, the defendant may not assert a different ground for his or her objection to the admission of evidence than was offered to the trier of fact.

42. **Trial: Expert Witnesses: Appeal and Error.** An objection on the basis of insufficient foundation is a general objection and fails to preserve a challenge on appeal to admissibility of expert testimony.

43. **Trial: Evidence.** Whether there is sufficient foundation evidence for the admission of physical evidence must necessarily be determined on a case-by-case basis.

44. **Trial: Evidence: Appeal and Error.** A trial court's determination of the admissibility of physical evidence will not ordinarily be overturned except for an abuse of discretion.

45. **Trial: Evidence: Photographs.** Photographic evidence is admissible when it is shown that it is a correct reproduction of what it purports to show, and such showing may be made by any evidence that bears on whether the photographic evidence correctly depicts what it purports to represent.

46. **Trial: Evidence: Photographs: Witnesses.** Under the illustrative model of authenticating photographic evidence, a photograph, motion picture, videotape, or other recording is viewed merely as a graphic portrayal of oral testimony and is admissible only when a witness testifies that it is a correct and accurate representation of facts that the witness personally observed.

47. **Criminal Law: Pretrial Procedure: Appeal and Error.** Unless granted as a matter of right under the Constitution or other law, discovery is within the discretion of a trial court, whose ruling will be upheld on appeal unless the trial court has abused its discretion.

48. **Constitutional Law: Criminal Law: Parties.** The federal Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.

49. **Parties: Testimony: Rules of Evidence.** A defendant does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.

50. **Criminal Law: Evidence.** The defendant's right to compulsory process is itself designed to vindicate the principle that the ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts.

51. **Evidence: Testimony.** Discovery, like cross-examination, minimizes the risk that a judgment will be predicated on incomplete, misleading, or even deliberately fabricated testimony.

52. **Evidence.** The State's interest in protecting itself against an 11th-hour defense is merely one component of the broader public interest in a full and truthful disclosure of critical facts.

53. **Pretrial Procedure: Appeal and Error.** Trial courts have broad discretion with respect to sanctions involving discovery procedures.

54. **Jury Instructions: Appeal and Error.** Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.

55. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the

evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.

56. **Jury Instructions: Appeal and Error.** In reviewing a claim of prejudice from jury instructions given or refused, an appellate court must read the instructions together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and evidence, there is no prejudicial error.

57. **Jury Instructions.** A trial court is not required to give a proffered instruction which unduly emphasizes a part of the evidence in the case.

58. **Jury Instructions: Proof: Appeal and Error.** In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.

59. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.

60. **Criminal Law: Evidence: Appeal and Error.** The relevant question when an appellate court reviews a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

61. **Sexual Assault: Words and Phrases.** A person commits first degree sexual assault of a child when he or she subjects another person under 12 years of age to sexual penetration and the actor is at least 19 years of age or older.

62. **Sexual Misconduct: Words and Phrases.** Any person who knowingly engages in sexual penetration with his or her child commits incest.

63. **Judicial Notice: Records: Rules of Evidence.** As a subject for judicial notice, existence of court records and certain judicial action reflected in a court's record are, in accordance with Neb. Rev. Stat. § 27-201(2)(b) (Reissue 2008), facts which are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned.

64. **Judicial Notice: Records: Collateral Estoppel: Res Judicata.** A court may judicially notice existence of its records and the records of another court, but judicial notice of facts reflected in a court's records is subject to the doctrine of collateral estoppel or of res judicata.

65. **Judicial Notice.** Judicial notice may be taken at any stage of the proceeding.

66. **Judicial Notice: Rules of Evidence: Words and Phrases.** A proceeding under Neb. Rev. Stat. § 27-201(6) (Reissue 2008) includes judicial activity which occurs after commencement of an action and includes judicial action in an appeal.
67. **Parental Rights.** A natural parent who relinquishes his or her rights to a child by a valid written instrument gives up all rights to the child at the time of the relinquishment.
68. **Parental Rights: Adoption.** After a decree of adoption has been entered, the natural parents of an adopted child shall be relieved of all parental duties and responsibilities for the child and shall have no rights over the child.
69. **Moot Question: Words and Phrases.** An issue is moot when it seeks to determine a question which does not rest upon existing facts or rights, in which the issues presented are no longer alive.
70. **Sentences.** Generally, it is within a trial court's discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively.
71. ____. A court is required to order consecutive sentences only for those specific crimes that require a mandatory minimum sentence to be served consecutively to other sentences imposed.
72. **Convictions: Sentences.** If the conviction requires only a mandatory minimum sentence but the statute does not mandate that the minimum sentence run consecutively to other sentences, the decision as to whether to run the sentences consecutively or concurrently is left to the sentencing court.
73. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.
74. **Sentences.** The test of whether consecutive sentences may be imposed under two or more counts charging separate offenses, arising out of the same transaction or the same chain of events, is whether the offense charged in one count involves any different elements than an offense charged in another count and whether some additional evidence is required to prove one of the other offenses.

Appeal from the District Court for Sarpy County: DAVID K. ARTERBURN, Judge. Affirmed.

Thomas P. Strigenz, Sarpy County Public Defender, and Colleen Hassett for appellant.

Douglas J. Peterson, Attorney General, and George R. Love for appellee.

Pirtle, Riedmann, and Bishop, Judges.

Riedmann, Judge.

## I. INTRODUCTION

Candice M. McMillion was convicted in the Sarpy County District Court of first degree sexual assault of a child under 12, incest, two counts of visual depiction of sexually explicit conduct, and child abuse. She appeals, assigning numerous errors with respect to her convictions and sentences. We affirm.

## II. BACKGROUND

### 1. Events Surrounding Charges

McMillion has been married to her husband, Caleb McMillion (Caleb), since March 2007. Their son, S.M., was born in August 2007. In late September 2012, after getting into an argument with Caleb, McMillion told her father-in-law that she had "put her mouth on [S.M.] a couple of times" and that she did so, in order to save her marriage, because Caleb "was into that." McMillion told him that Caleb had done similar acts to S.M. Shortly after their conversation ended, McMillion sent a text message to her mother-in-law and recanted. She said that she had lied and made up what she said to hurt Caleb. S.M. underwent a forensic interview at the time but did not disclose any abuse. He was removed from McMillion and Caleb's home in early October, however, due to domestic violence issues, and was placed with his paternal grandparents.

Because S.M. was acting out and displaying inappropriate behaviors, in January 2013, he began attending weekly therapy sessions with Amanda Gurock, a licensed independent mental health practitioner. After the first session, Gurock diagnosed S.M. with adjustment disorder with a disturbance of mixed emotions and conduct and anxiety disorder, not otherwise specified. Gurock also diagnosed S.M. with anxiety disorder because he was fidgety, had a lot of nervousness, had fears of different situations, and had bad dreams.

On February 18, 2013, S.M. disclosed to Gurock that he had been sexually abused by McMillion and Caleb numerous

times between the ages of 3 and 5. He specifically described the abuse, including that McMillion performed oral sex on him and forced him to do the same to her. S.M. underwent a forensic interview at Project Harmony, a child advocacy center, on February 20. Based on the information S.M. provided to Gurock and the forensic interviewer, McMillion was arrested and ultimately charged with count I, first degree sexual assault of a child under 12; count II, incest; counts III and IV, visual depiction of sexually explicit conduct; and count V, child abuse. Caleb was also arrested and charged with similar offenses.

## 2. PRETRIAL MOTIONS

### (a) Motion in Limine

Prior to trial, McMillion filed a motion in limine to prohibit the State from eliciting testimony of the statements S.M. made to Gurock and the Project Harmony interviewer. At a hearing on the motion, Gurock testified that she takes notes during her sessions with S.M. to remind herself what they talked about. The notes that are kept in the official file are general due to concerns about confidentiality, and they generally indicate what occurred at each session. However, Gurock also takes handwritten notes in a notebook where she writes down "a couple of words," and those notes are not kept in the official file. Gurock indicated that she reviewed her handwritten notes in preparation of giving testimony at the hearing.

Based on Gurock's admission that she refreshed her recollection with her handwritten notes prior to testifying, McMillion requested during the hearing that the court order Gurock to turn over her notes. The court observed that there had been no refreshing of recollection in the courtroom, and the notes had not been utilized during testimony. Thus, the court declined to order Gurock to produce her notes.

In a later written order, the district court ruled on McMillion's motion in limine, finding that the statements S.M. made during therapy sessions fall under an exception to the hearsay rule and

are therefore admissible. The court also found that the statements S.M. made during the Project Harmony interview would be admissible only if S.M. testified at trial.

### (b) Motion to Suppress

At the time Caleb was arrested, police seized the cell phone he had with him, which contained a memory card. Police applied for and received a search warrant for the phone and its memory card and ultimately searched them.

McMillion filed a motion to suppress the search of the cell phone and memory card. At the suppression hearing, Det. Roy Howell testified that after receiving the search warrant, he made a bit-by-bit physical copy of the memory card contained in the phone. He explained that the file structure of the type of memory card in Caleb's phone is specific to the phone. On the memory card taken out of Caleb's phone, Howell found a "Mobo folder," which is associated with an application that was downloaded onto the phone. The Mobo folder is specific to Caleb's phone. Inside the Mobo folder, Howell discovered two photographs of McMillion performing oral sex on S.M. The photographs are still shots derived from two videos, but the videos were never recovered.

Caleb testified at the suppression hearing that he and McMillion separated in September 2012 but maintained frequent contact during their separation. They jointly owned approximately five similar memory cards, but from the time they separated until their arrests, Caleb had no access to the memory card in McMillion's cell phone and she had no access to his phone's memory card. He considered the memory card found in his phone at the time of arrest, from which the photographs were recovered, to be his memory card. That particular memory card contained data associated with Caleb's e-mail account and other personal folders and applications that he manually installed on his phone. McMillion and Caleb shared a joint cell phone account, and both paid the bill. Before they separated, McMillion knew the passcode to Caleb's phone "for the most part," but after separation,

Caleb changed his passcode often because he did not want McMillion to know it.

McMillion also testified at the suppression hearing and said that even after she and Caleb separated, she still had the opportunity to use his cell phone. She also acknowledged telling her grandmother that she did not know what was on Caleb's phone because he always had it locked and hid it from her. However, she testified that even if she did not know Caleb's passcode, she was able to bypass it and access his phone by inputting his e-mail address and changing his passcode.

In its subsequent order, the district court observed that the search warrant authorized the search of the cell phone and its memory card. The phone and memory card are specifically described in the warrant as belonging to Caleb, from whom they were seized at the time of his arrest. The memory card contained items specifically belonging to Caleb but no items belonging to McMillion. The court therefore determined that McMillion lacked standing to challenge the search of Caleb's phone and memory card, because she did not have a legitimate expectation of privacy in Caleb's phone or memory card. The motion to suppress was therefore denied.

### (c) Motion to Withdraw

Before trial commenced, the State filed a motion to endorse additional witnesses, including two individuals that had been represented by McMillion's trial counsel's office. McMillion's trial counsel then filed a motion to withdraw based on a potential conflict of interest. At a hearing on the motion, he indicated that he believed he had a conflict of interest. The court received into evidence affidavits from both potential witnesses waiving attorney-client privilege and waiving any conflict of interest. McMillion and the State also stipulated that there was no relationship between the witnesses' cases and McMillion's case.

The district court found that there was no evidence McMillion's counsel would have divided loyalties which would prevent him from providing effective representation

to McMillion and that there was nothing about the witnesses which would detract from his ability to zealously represent McMillion. Therefore, the motion to withdraw was denied.

### (d) Motion to Sequester Jury

After the jury had been selected but before opening statements or presentation of any evidence, McMillion moved to sequester the jury during the pendency of trial. The court denied the motion.

### (e) Motion for Mistrial

During opening statements, the State highlighted McMillion's explanations and how her story changed over time. It explained that McMillion initially denied sexually assaulting S.M., but that once the photographs were found on Caleb's cell phone, she could not deny it happened, and her story changed. The prosecutor then said:

> It could no longer be it never happened. I was making it all up. It then became other stories and other reasons why this may have happened. She may take the stand and she may try and tell you those stories, those many stories that began after the evidence was found.

At the conclusion of the State's opening statement, McMillion moved for mistrial on the ground that the State improperly referenced McMillion's taking the stand, which violated her constitutional right to remain silent. The motion was denied.

### (f) Motion to Remove Juror

After opening statements but prior to the presentation of evidence, the mother of a juror e-mailed a member of the county attorney's office. The mother indicated that her daughter had informed her that the daughter had been selected for a jury, and the mother asked about the daughter's employer's responsibility to pay her while she was serving on the jury. The member of the county attorney's office explained to the judge that the mother was an acquaintance of hers and that she did not respond to the e-mail.

Based on the correspondence, McMillion asked that the juror be removed from the panel and replaced with an alternate. The district court observed that the concern seemed to be that of the mother and that there was no indication in the e-mail that there was any concern expressed by the juror as to the impact of jury service on her employment. The court noted that it had admonished the jurors that they could disclose that they were on a jury but could not talk about the case, and there was no indication in the e-mail that that responsibility was breached. The court also noted that the parties discussed during voir dire this juror's employment and acquaintance with the county attorney, and no motion to strike was made. Therefore, the court denied the request to remove the juror.

### 3. Trial

Witnesses at trial testified regarding the events leading up to McMillion's arrest. Caleb testified that he had entered into a plea agreement for his charges and volunteered to testify against McMillion to prevent S.M. from being called to testify. He described an incident in June 2012 where he witnessed McMillion performing oral sex on S.M. and recorded a video of it on his cell phone. Caleb also described other pornographic videos he made with McMillion and said that she voluntarily participated in them.

S.M.'s paternal grandparents testified about S.M.'s behavior when he first came to live with them in October 2012. S.M. was exhibiting inappropriate sexual behaviors at preschool and was also violent. S.M. was afraid of McMillion and frequently expressed fear that she would come to hurt his grandparents and "get him."

Gurock testified regarding her role as S.M.'s counselor. She outlined her original diagnoses for him and explained that after he disclosed the sexual abuse to her, she changed his diagnoses to posttraumatic stress disorder, mood disorder not otherwise specified, and attention deficit hyperactivity

disorder. She also explained that it is normal for children to delay reporting sexual abuse, in part because they wait until they are comfortable with someone and trust him or her enough to say something.

In S.M.'s fifth session with Gurock, he disclosed the sexual abuse, describing the events in detail. S.M. said the sexual abuse occurred when he was between the ages of 3 and 5, when he lived with McMillion and Caleb. He said the abuse happened many times in their bedroom. S.M. reported that Caleb told him not to talk about "inappropriate things," so he was not supposed to tell anyone or he would get soap in his mouth.

McMillion testified in her own defense. She said that she and Caleb had been together since she was 18 years old and that he was physically and verbally abusive during their relationship. Much of the abuse centered on sexual activity which included other partners and participation in "fetish videos." McMillion testified that she acquiesced because Caleb threatened to find someone else if she refused and she wanted to make him happy. McMillion felt that she was controlled by Caleb and that she could not say no or stand up for herself.

McMillion admitted that the photographs on Caleb's cell phone accurately depicted what occurred, but said she did not remember doing what was depicted. She also admitted telling her father-in-law that she and Caleb had sexually assaulted S.M. and that she had done so to save her marriage, and she admitted to immediately recanting her claims. McMillion acknowledged writing letters to friends and family from jail indicating that she has no memory of the assaults and telling them that she had been drugged.

A psychiatrist who evaluated McMillion in November 2013 concluded that she was a victim of "spousal abuse, sexual" based upon Caleb's manipulating her through verbal and physical abuse to perform sexual acts she did not want to do. The psychiatrist opined McMillion had basically abdicated control to Caleb, knew that she could be physically and verbally

abused, and knew that things could get worse for her if she did not do what she was told. The psychiatrist concluded that McMillion was afraid not to do what she was told and that a large number of her actions, in his opinion, were therefore involuntary.

The jury also heard testimony from a licensed clinical psychologist who evaluated McMillion. He diagnosed her with posttraumatic stress disorder with dissociative features. He believed that she has had that diagnosis since her late teens or early 20's. In his opinion, she had significant and notable behavioral health problems throughout the entirety of her relationship with Caleb and subjugated herself to him and his coercion and manipulation.

On rebuttal, the State presented the testimony of a forensic psychiatrist who evaluated McMillion to determine whether she suffered from any type of dissociation. He explained that dissociation generally deals with being in a different personality, like a multiple personality, assuming a different identity sometimes. McMillion never mentioned any dissociative experiences to the forensic psychiatrist, and he never saw any signs of dissociation in her. Thus, he did not believe she suffered from any type of dissociation.

The State also presented rebuttal testimony from two witnesses who had been incarcerated with McMillion in April 2014. Both witnesses testified that McMillion told them she engaged in the activity for which she was charged to please Caleb, but that her defense was that she had been drugged. One of the witnesses testified McMillion said that Caleb was supposed to have thrown his cell phone in the river and that if he had, there would be no evidence and she would not be in the situation she was in.

### 4. JURY INSTRUCTIONS

At the jury instruction conference, McMillion tendered three proposed jury instructions. The court declined to give her instructions as proposed.

### 5. VERDICT AND SENTENCING

The jury ultimately convicted McMillion of all five counts. At sentencing, the parties and district court discussed whether the law required that the court order consecutive sentences. The district court found that regardless of the requirements, the nature of the offenses in the present case merited consecutive sentences. McMillion was then sentenced to imprisonment as follows: on count I, 30 to 50 years; on count II, 1 to 5 years; on count III, 3 to 5 years; on count IV, 3 to 5 years; and on count V, 2 to 5 years. The district court orally stated that S.M. was not required to have any contact with McMillion while she is serving her sentence, but the written sentencing order prohibited McMillion from having contact with S.M. McMillion timely appeals to this court.

Further factual details will be set forth below, as relevant to McMillion's specific assignments of error.

## III. ASSIGNMENTS OF ERROR

McMillion alleges, consolidated and restated, that the district court erred in (1) failing to order Gurock to turn over her office notes; (2) denying her motion to suppress; (3) denying her trial counsel's motion to withdraw; (4) denying her motion to sequester the jury; (5) denying her motion for mistrial during opening statements; (6) denying her request to remove the juror; (7) allowing Howell to give an expert opinion; (8) receiving the photographs into evidence over her objection; (9) granting the State's motion in limine as to McMillion's treating physician, Dr. Ashley Falk; (10) failing to give her proposed jury instructions; (11) finding sufficient evidence to sustain the convictions; and (12) sentencing her improperly and excessively.

## IV. ANALYSIS

### 1. GUROCK'S OFFICE NOTES

McMillion first argues that the district court erred in failing to require Gurock to produce her office notes when she testified that she reviewed them prior to testifying and they

refreshed her recollection as to some of the disclosures S.M. made to her. We agree, but find the error was harmless and therefore does not constitute reversible error.

[1] If a witness uses a writing to refresh his or her memory for the purpose of testifying, either before or while testifying, an adverse party is entitled to have it produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce into evidence those portions which relate to the testimony of the witness. Neb. Rev. Stat. § 27-612 (Reissue 2008). Section 27-612 requires production of not only documents used to refresh recollection in the courtroom while the witness is testifying, but also those writings the witness reviewed prior to giving testimony. Thus, the district court erred in the basis upon which it denied McMillion's request for access to Gurock's notes.

[2,3] On appeal, the State argues that the notes were privileged under Neb. Rev. Stat. § 27-504 (Reissue 2008), and therefore not subject to disclosure. Section 27-504 provides a privilege for professional counselor-patient communications. However, McMillion was being prosecuted for, in part, first degree sexual assault of a child and child abuse. Under § 27-504(4)(d), no privilege exists in criminal prosecutions for injuries to children. Neb. Rev. Stat. § 28-707(2) (Reissue 2008) specifically states that the statutory privilege between patient and professional counselor is not available in a prosecution for child abuse. Therefore, these records were not privileged and the court erred in refusing to order that they be produced.

[4,5] But rejection of McMillion's request for access to Gurock's notes was harmless error inasmuch as no "'substantial miscarriage of justice'" occurred as a result of the error. See *State v. Schroder*, 232 Neb. 65, 71, 439 N.W.2d 489, 493 (1989). Accord Neb. Rev. Stat. § 29-2308 (Reissue 2008). Harmless error exists in a bench trial of a criminal case when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence

the court in a judgment adverse to a substantial right of the defendant. *State v. Schroder, supra*. The erroneous ruling in the present case occurred during a pretrial hearing, which, like a bench trial, is presided over by the court only with no jury present.

Here, the issue arose during a hearing on McMillion's motion in limine, which requested that the court prohibit the State from introducing into evidence at trial S.M.'s statements to Gurock. McMillion argues on appeal, "At a minimum, [McMillion] was placed at a disadvantage in not being able to review those notes and at worst, there has been a violation of [her] 6th Amendment right to confrontation." Brief for appellant at 21.

We disagree because the court's focus in denying the motion in limine was not on the substance of S.M.'s statements, which was the focus of Gurock's notes, but, rather, on the context in which the statements were made. In other words, the district court refused to exclude S.M.'s statements because it found they fell under the hearsay exception which allows into evidence statements made for the purpose of medical diagnosis or treatment. Thus, the content of Gurock's notes would not have materially influenced the court's ruling on the motion in limine.

[6] We also reject McMillion's argument that failure to provide the notes violated her constitutional right to confrontation. Confrontation Clause rights are trial rights that do not extend to pretrial hearings in state proceedings. *State v. Daly*, 278 Neb. 903, 775 N.W.2d 47 (2009). And in any event, McMillion was allowed to fully cross-examine Gurock at the hearing regarding the context of the statements and her notes without limitation or interference from the court. See *State v. Schreiner*, 276 Neb. 393, 754 N.W.2d 742 (2008) (Confrontation Clause guarantees opportunity for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent the defense might wish). Accordingly, we find no reversible error.

## 2. Denial of Motion to Suppress

McMillion argues that the district court erred in denying her motion to suppress for three reasons. First, she claims the court erroneously concluded that she lacked standing to challenge the search of Caleb's cell phone and memory card.

[7] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *State v. Tyler*, 291 Neb. 920, 870 N.W.2d 119 (2015).

[8-10] A "standing" analysis in the context of search and seizure is nothing more than an inquiry into whether the disputed search and seizure has infringed an interest of the defendant in violation of the protection afforded by the Fourth Amendment. *State v. Nelson*, 282 Neb. 767, 807 N.W.2d 769 (2011). The test used to determine if a defendant has an interest protected by the Fourth Amendment is whether the defendant has a legitimate or justifiable expectation of privacy in the premises. See *id*. Ordinarily, two inquiries are required. First, an individual must have exhibited an actual (subjective) expectation of privacy, and second, the expectation must be one that society is prepared to recognize as reasonable. *Id*.

[11-13] With regard to the content of cell phones, an accused must first establish that he personally has a legitimate expectation of privacy in the object that was searched. *U.S. v. Turner*, 781 F.3d 374 (8th Cir. 2015). An individual may demonstrate infringement of his or her own legitimate expectation of privacy by showing that he owned the premises or that he occupied them and had dominion and control over them based on permission from the owner. *State v. Nelson, supra*. Other factors relevant to the determination of standing include historical use of the property or item, ability to regulate access, the

totality of the circumstances surrounding the search, the existence or nonexistence of a subjective anticipation of privacy, and the objective reasonableness of the expectation of privacy considering the specific facts of the case. See *U.S. v. Gomez*, 16 F.3d 254 (8th Cir. 1994).

As noted above, we review the trial court's factual findings for clear error. The factual findings made by the district court in the present case were largely undisputed. McMillion and Caleb each had their own cell phones, which they used to communicate with each other. They had been separated and living apart for approximately 5 months prior to the seizure of Caleb's phone. The phone was seized from Caleb's person at the time of his arrest. McMillion could not say with certainty that she ever used the particular memory card in Caleb's phone at any time, and the memory card contained data specific to Caleb such as his e-mail account and applications he installed on his phone.

In addition, the district court found that Caleb sought to exclude McMillion from having access to his cell phone by changing the passcode. McMillion admitted that although she was able to access Caleb's phone, she had to "break into" the phone in order to do so. The foregoing historical facts are supported by the record and are therefore not clearly erroneous. Our next question is whether, based on these facts, McMillion had standing to challenge the search of Caleb's phone and memory card.

McMillion argues that she had a legitimate expectation of privacy in the memory card because she had dominion and control over it. We disagree. Although McMillion and Caleb testified their various memory cards could have been switched when they were living together prior to their separation, McMillion was unable to say whether she had ever used this particular memory card. The card contained information specific to Caleb's cell phone, including applications he had manually installed and photographs and videos he had taken with his phone and saved to the memory card. On the other

hand, the memory card contained no information or data specific to McMillion. Moreover, the memory card was inside Caleb's phone when the phone was seized from him, and he had actively attempted to exclude McMillion from using and accessing his phone during the prior 5 months. He testified that after they separated, McMillion did not know the passcode to his phone and he did not want her to have it, so he changed it often.

In cases where the accused is not the owner of the premises but has been found to possess standing to challenge the search, the accused generally has permission from the owner to exert control over the premises at the time. See e.g., *State v. Nelson*, 282 Neb. 767, 807 N.W.2d 769 (2011) (driver of rental vehicle found to have standing to challenge search of vehicle upon proof authorized lessee gave permission to operate vehicle), and *State v. Lara*, 258 Neb. 996, 607 N.W.2d 487 (2000) (guest had standing as to certain areas of home in which he was staying). The Supreme Court has acknowledged that standing is not limited to property rights or ownership, but Nebraska precedent shows the importance of dominion and control in the standing analysis. See *State v. Nelson, supra*.

In the context of a cell phone, the Fifth Circuit in *U.S. v. Finley*, 477 F.3d 250 (5th Cir. 2007), determined that the defendant did have standing to challenge the search of his cell phone, which had been issued to him by his employer, based on his dominion and control over the phone. However, the employee had a right to exclude others from using the phone, he was permitted to use the phone for personal use, he exhibited a subjective expectation of privacy in the phone, and he took normal precautions to maintain his privacy in the phone. *Id*.

To the contrary in the present case, McMillion did not possess an ownership interest in or dominion or control over Caleb's cell phone or the memory card it contained. Not only did she not possess a right to use the phone, but she did

not have the right to exclude others from the phone either. That right belonged solely to Caleb. We therefore find that the district court did not err in concluding that McMillion lacked standing to challenge the search of Caleb's phone and memory card.

[14] Based on this conclusion, we need not address McMillion's other arguments related to the search of Caleb's cell phone and denial of her motion to suppress. See *State v. Planck*, 289 Neb. 510, 856 N.W.2d 112 (2014) (appellate court is not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it).

### 3. DENIAL OF MOTION TO WITHDRAW

McMillion contends that the district court erred in failing to order withdrawal of her trial counsel. She specifically claims the district court erred in denying her attorney's motion to withdraw because it failed to engage in the balancing test set forth in *Wheat v. United States*, 486 U.S. 153, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988). In *Wheat*, the analysis focused on an attorney's joint representation of coconspirators and the effect of waiver on multiple representations. The Supreme Court held that in determining whether to disqualify counsel, a court must balance two Sixth Amendment rights: (1) the defendant's right to be represented by counsel of choice and (2) his or her right to a defense conducted by an attorney who is free of conflicts of interest. *Id*.

[15,16] McMillion's reliance on *Wheat* is misplaced. Here, the State's witnesses against her were not charged in the same conspiracy as McMillion and the cases in which they were represented by McMillion's trial counsel had ended. More importantly, however, McMillion was represented by the public defender's office. The public defender's duty is to represent all indigent felony defendants. See Neb. Rev. Stat. § 23-3402 (Reissue 2012). An indigent criminal defendant's Sixth Amendment right to counsel does not include the right to counsel of the indigent defendant's own choice. *State v. Dixon*,

286 Neb. 157, 835 N.W.2d 643 (2013). Thus, no balancing test was necessary, because McMillion did not have a constitutional right to counsel of her choice.

[17,18] She did have a Sixth Amendment right to effective assistance of counsel, however, which includes representation free of conflicts of interest which adversely affect her lawyer's performance. See *State v. Sandoval*, 280 Neb. 309, 788 N.W.2d 172 (2010). In Nebraska, the right to effective assistance of counsel has been interpreted to entitle the accused to the undivided loyalty of an attorney, free from any conflict of interest. *Id*. Whether a defendant's lawyer's representation violates a defendant's right to representation free from conflicts of interest is a mixed question of law and fact that an appellate court reviews independently of the lower court's decision. *Id*.

[19-21] The fact that an attorney has other clients, including one who would be a State witness and testify at trial, is not sufficient in and of itself to constitute a conflict of interest. *State v. Marchese*, 245 Neb. 975, 515 N.W.2d 670 (1994). The phrase "conflict of interest" denotes a situation in which regard for one duty tends to lead to disregard for another or where a lawyer's representation of one client is rendered less effective by reason of his or her representation of another client. *State v. Dunster*, 262 Neb. 329, 631 N.W.2d 879 (2001). The defendant who shows that a conflict of interest actually affected the adequacy of his or her representation need not demonstrate prejudice, but such conflict of interest must be shown to have resulted in conduct by counsel that was detrimental to the defense. *Id*.

[22] In the case at hand, the State's witnesses were former clients of McMillion's counsel, and thus, this is not a case of concurrent representation, but, rather, a case of successive representation. Because no direct or concurrent representation is involved, there is no actual conflict. See *State v. Ehlers*, 262 Neb. 247, 631 N.W.2d 471 (2001). Therefore, the question is whether McMillion's trial counsel's former representation

of the State's two witnesses resulted in a potentially serious conflict of interest. See *id*. In other words, Did counsel's duty to his former clients result in disregard for McMillion or result in less effective representation of McMillion? We find it did not.

[23] According to the Nebraska Rules of Professional Conduct governing former client conflicts of interest, a lawyer who formerly represented a client in a matter is prohibited from thereafter representing another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing. Neb. Ct. R. of Prof. Cond. § 3-501.9(a).

In the present case, the parties stipulated that there was no relationship between the witnesses' cases and McMillion's case. At the time the witnesses signed their affidavits, their cases had been resolved and the time for appeal had passed. The witnesses' affidavits indicate that neither of them provided any information during the time they were represented by the public defender's office that would be useful in McMillion's case. Moreover, both witnesses signed waivers of any conflicts of interest and attorney-client privilege. As a result, we find no error in the district court's denial of McMillion's counsel's motion to withdraw.

### 4. Denial of Motion
#### to Sequester Jury

McMillion assigns that the district court erred in denying her motion to sequester the jury. We disagree.

[24-26] Neb. Rev. Stat. § 29-2022 (Reissue 2008) requires that a jury be sequestered "[w]hen a case is finally submitted to the jury . . . ." Whether a jury is to be kept together before submission of the cause in a criminal trial is left to the discretion of the trial court. *State v. Gales*, 269 Neb. 443, 694 N.W.2d 124 (2005). To warrant reversal, denial of a motion to sequester the jury before submission of the cause must be shown to have prejudiced the defendant. *Id*.

McMillion argues that she was prejudiced because the county attorney's office was posting information about her case on social media, there was extensive media publicity, and one of the jurors told her mother that she was selected for the case. At a hearing on the sequestration motion, McMillion offered into evidence six news articles relating to the case. The evidence included information the county attorney's office posted on social media in January 2014 indicating that Caleb entered no contest pleas to several of his charges. As will be discussed below, there was also an incident where the mother of a juror contacted the county attorney's office with a question after the juror informed her mother that she had been selected for a jury.

Contrary to McMillion's argument, none of this evidence indicates that the jurors were seeking out information related to the case. The fact that there was media coverage of the case does not mean the jurors were aware of it or that it impacted their impartiality as to the case. Voir dire is not contained in the record before us, but the district court observed that only one prospective juror indicated that he may have heard something about the case in the media. Further, the e-mail sent by the selected juror's mother simply stated that the juror had informed her mother that she was selected for a jury; there was no evidence that she told her mother which case she was selected for.

The district court found that although there had been media coverage, the coverage was not so pervasive as to require the court to sequester the jury prior to submission of the case. At each recess, the court admonished the jury to refrain from listening to any information about the case outside of the courtroom, talking about the case, and forming or expressing an opinion of the case until it was submitted for their deliberation. There was no evidence presented rebutting the presumption that the jurors followed the instructions they were given. See *State v. Gales, supra*. Accordingly, the district court did not abuse its discretion in refusing to sequester the jury prior to submission of the case.

### 5. DENIAL OF MOTION FOR MISTRIAL

McMillion asserts that the court erred in failing to grant a mistrial when, during opening statements, the State improperly referenced her right to remain silent under the Fifth Amendment. We find no merit to this argument.

[27] Whether to grant a mistrial is within the trial court's discretion, and an appellate court will not disturb its ruling unless the court abused its discretion. *State v. Ramirez*, 287 Neb. 356, 842 N.W.2d 694 (2014).

[28-31] Prosecutors are charged with the duty of conducting criminal trials in such a manner that an accused may have a fair trial. *State v. Pierce*, 231 Neb. 966, 439 N.W.2d 435 (1989). A prosecutor's comment on a defendant's silence in the defendant's trial is a violation of an accused's right to remain silent under the 5th and 14th Amendments to the U.S. Constitution and under article I, § 12, of the Nebraska Constitution. *State v. Pierce, supra*. The prohibition against a prosecutor's comment on a defendant's right to remain silent applies throughout a trial, including the opening statement and closing argument during the defendant's trial. *Id*. In an opening statement for a jury trial, a prosecutor's comment concerning the necessity of the defendant's testimony or an expression concerning the plausibility or credibility of anticipated testimony from a defendant violates an accused's right to remain silent at trial. *Id*.

The defendant in *Pierce* was charged with criminal mischief. During opening statements at trial, the prosecutor told the jury that the defendant "'will testify but we do not know which version of the facts to which he will testify.'" *Id*. at 969, 439 N.W.2d at 439. The defendant moved for mistrial, arguing the remark violated his constitutional right to remain silent. His motion was denied.

On appeal, the Supreme Court observed that the prosecutor's remark immediately made the defendant's credibility an issue in the case before introduction of any evidence. As a result, either the defendant could remain silent and thereby

give credence to, or even substantiate, the innuendo that he had previously given inconsistent versions of the incident on which the criminal charge was based, or he could take the witness stand and recount a version without any inconsistency, thereby responding to the prosecutor's intimation of inconsistency but subjecting himself to cross-examination.

The Supreme Court observed that the insinuation of multiple versions could lead a jury to believe that the defendant, before trial, had admitted his criminality in the charged offense, rendering all in-court evidence irrelevant because the defendant had already admitted his guilt. Therefore, the court held that the prosecutor's statement compelled the defendant to testify and was therefore a violation of his constitutional right to remain silent. *State v. Pierce, supra*.

The dangers from *Pierce* are not present in the instant case. The State referenced that McMillion *may* take the stand and *may* tell "her . . . stories," whereas the prosecution in *Pierce* affirmatively asserted that the defendant would testify. Furthermore, the only evidence of liability adduced by the State in *Pierce* was from the driver of a damaged vehicle. Therefore, the Supreme Court questioned how the prosecution could know that the defendant gave more than one version of the incident and concluded that the insinuation of multiple versions could lead a jury to believe that he had admitted his culpability before trial.

In the present action, however, the fact that McMillion expressed more than one version of facts was known and proved at trial by evidence from multiple witnesses. It was undisputed that McMillion admitted to "put[ting her] mouth on" S.M., immediately recanted, and continued to deny assaulting S.M. until the photographs were found. Unlike many sexual assault cases, the question was not whether McMillion had sexually assaulted S.M., but, rather, whether her defense was plausible. So the fact that McMillion initially denied assaulting S.M. had less of an impact than it would in a case such as *State v. Pierce*, 231 Neb. 966, 439 N.W.2d 435 (1989), where

the State was attempting to prove that the defendant committed acts which he denied.

Furthermore, in *Pierce*, the court found the prosecutor's statement was prejudicial because the defendant felt compelled to testify in order to deny the State's insinuation that he had previously admitted to committing the crime, and his credibility was placed at issue by the State's remark. Here, McMillion's credibility was already an issue; the State's theory was that her later claims that she committed the acts because Caleb coerced her into doing them were unbelievable because she changed her story so many times. This theory was supported by admissible evidence regardless of the State's comments during opening statements. See, also, *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006) (finding no error in opening statement that highlighted defendant's contradictory statements and concluding that if defendant felt compelled to take stand, it was result of evidence adduced and not opening statement setting forth anticipated evidence).

[32-35] Moreover, before it is necessary to grant a mistrial for prosecutorial misconduct, the defendant must show that a substantial miscarriage of justice has actually occurred. *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006). A party is allowed considerable latitude in making an opening statement. See *State v. Ruegge*, 21 Neb. App. 249, 837 N.W.2d 593 (2013). The impact of any comment made at trial depends on the atmosphere at trial. *State v. Ramold*, 2 Neb. App. 545, 511 N.W.2d 789 (1994). The trial judge is in a better position to measure the impact a comment has on a jury, and his or her decision will not be overturned unless clearly erroneous. *Id*.

[36] Here, the disputed comment was a single remark made during opening statements of a 6-day trial. In denying the motion for mistrial, the district court properly recognized that it is permissible for the State to discuss what the evidence may show. See *U.S. v. Kalagian*, 957 F.2d 527 (8th Cir. 1992) (prosecutor's opening statement should objectively outline evidence reasonably expected to be introduced during trial). As

stated above, the evidence presented at trial established that McMillion had changed her story over the course of time, and whether she had, in fact, engaged in sexual acts with S.M. was affirmatively proved by way of the photographs. We therefore find the court's conclusion that the prosecutor's comment did not have a prejudicial impact on the jury was not clearly erroneous. Accordingly, the court did not abuse its discretion in denying the motion for mistrial.

[37] We note that McMillion also points out that the State commented on the Project Harmony interview during its opening statement, and she moved for mistrial on that basis as well. However, she does not argue this error on appeal and concludes her argument regarding prosecutorial misconduct with the statement that because the State violated her Fifth Amendment rights, the case should be remanded. Errors that are assigned but not argued will not be addressed by an appellate court. *State v. Harris*, 284 Neb. 214, 817 N.W.2d 258 (2012).

### 6. Failure to Remove Juror

[38] McMillion challenges the district court's refusal to remove a juror after the juror's mother contacted the county attorney's office. Her entire argument is contained in one sentence: She was prejudiced by the court's failure to remove the juror. The retention or rejection of a juror is a matter of discretion for the trial court. *State v. Robinson*, 272 Neb. 582, 724 N.W.2d 35 (2006), *abrogated on other grounds, State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 749 (2010). This rule applies both to the issue of whether a venireperson should be removed for cause and to the situation involving the retention of a juror after the commencement of trial. *Id.*

[39,40] In a criminal case, jury misconduct must be demonstrated by clear and convincing evidence. *Id.* Where the jury misconduct in a criminal case involves juror behavior only, the burden to establish prejudice rests on the party claiming the misconduct. *Id.*

In the instant case, the evidence establishes only that the juror informed her mother that she had been selected for a jury, which is permissible. There was no evidence that the juror asked her mother to contact the county attorney's office or informed her mother for which case she was selected. There was nothing to suggest any improper behavior on the part of the juror. As such, McMillion has failed to establish that she was prejudiced by the contact, and thus, the court did not abuse its discretion in denying her request to remove the juror.

## 7. ALLOWING IMPROPER EXPERT OPINION

McMillion claims the district court erred in allowing Howell, a detective, to give an improper expert opinion. During his testimony at trial, Howell explained that he conducted a forensic examination of Caleb's cell phone and memory card and discovered the two photographs of McMillion and S.M. Howell was asked several questions about his opinion as to the creation dates of the photographs, whether creation dates can be modified, and whether he can tell if the creation dates of the photographs are accurate. McMillion interposed several objections on the grounds of foundation and speculation, but her objections were overruled. Howell ultimately opined as to the file creation dates, but said he could not give a date as to when the photographs were actually taken.

On appeal, McMillion claims that Howell's opinions of the file creation dates were inadmissible because he is not an expert in date forgery analysis and his opinion is not appropriate lay witness testimony under Neb. Rev. Stat. § 27-701 (Reissue 2008). She claims that Howell did not have the qualifications to testify about date forgery analysis, and the court did not investigate whether he had such qualifications.

[41,42] We first observe that none of the opinions that McMillion claims were erroneously admitted were objected to at trial on the grounds she now asserts. On appeal, the defendant may not assert a different ground for his or her objection to the admission of evidence than was offered to the trier of

fact. *State v. Harris*, 263 Neb. 331, 640 N.W.2d 24 (2002). The Supreme Court has specifically determined that an objection on the basis of insufficient foundation is a general objection and fails to preserve a challenge on appeal to admissibility of expert testimony. See *State v. King*, 269 Neb. 326, 693 N.W.2d 250 (2005).

Here, because McMillion objected to Howell's opinions at trial only on the grounds of foundation and speculation, appellate review of her argument that Howell was permitted to give an improper expert opinion has been waived.

### 8. Receiving Exhibits into Evidence

The photographs found on Caleb's cell phone of McMillion and S.M. were offered into evidence at trial as exhibits 31 and 32. Caleb was the first witness to testify for the State at trial, and he explained that in June 2012, he witnessed McMillion perform oral sex on S.M. He recorded a video of it on his cell phone. He deleted the video, but photographs from it were later recovered by police. He confirmed the photographs contained in exhibits 31 and 32 were from the video he recorded and identified the people in the photographs as McMillion and S.M. He agreed that the photographs fairly and accurately depict what he observed in June 2012. McMillion objected on foundational grounds, but her objection was overruled. The photographs were then received into evidence.

On appeal, McMillion argues that the court erred in receiving the photographs into evidence. She claims the photographs lack sufficient foundation because the date they were taken was disputed when Caleb said they were taken in June 2012, but the forensic examination showed they were created in December 2011. We disagree.

[43,44] Whether there is sufficient foundation evidence for the admission of physical evidence must necessarily be determined on a case-by-case basis. *State v. Anglemyer*, 269 Neb. 237, 691 N.W.2d 153 (2005). A trial court's determination of the admissibility of physical evidence will not ordinarily be overturned except for an abuse of discretion. *Id*.

[45,46] Neb. Rev. Stat. § 27-901 (Reissue 2008) provides in relevant part:

> (1) The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
>
> (2) By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
>
> (a) Testimony that a matter is what it is claimed to be;
>
> . . . .
>
> (d) Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances;
>
> . . . .
>
> (i) Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result[.]

Photographic evidence is admissible when it is shown that it is a correct reproduction of what it purports to show, and such showing may be made by any evidence that bears on whether the photographic evidence correctly depicts what it purports to represent. *State v. Anglemyer, supra*. Under the illustrative model of authenticating photographic evidence, a photograph, motion picture, videotape, or other recording is viewed merely as a graphic portrayal of oral testimony and is admissible only when a witness testifies that it is a correct and accurate representation of facts that the witness personally observed. *Id*.

In the instant case, the State presented sufficient foundation to support the finding that the photographs depicted what they were purported to depict. Caleb's testimony, summarized above, connects what is depicted in exhibits 31 and 32 with what he personally observed and recorded on his cell phone. The photographs were stored in a folder on the memory card in Caleb's phone until they were recovered by police after his

arrest. McMillion claims the photographs lacked sufficient foundation because their creation dates were disputed. The dispute was not raised, however, until later in trial, when Howell testified. The photographs were received into evidence while Caleb, the State's first witness, was testifying. Consequently, we find no abuse of discretion in the district court's decision to receive the photographs into evidence. Any disparity in the testimony as to when the photographs were taken is a matter of weight and credibility, not a matter of admissibility. See *Ford v. Estate of Clinton*, 265 Neb. 285, 656 N.W.2d 606 (2003).

### 9. GRANTING MOTION IN LIMINE AS TO FALK

During trial, the State made an oral motion in limine as to the testimony of defense witness Falk due to a discovery violation. Falk was McMillion's treating physician from 2011 until the time of McMillion's arrest. The defense notified the State on September 5, 2014, of its intention to call Falk as a witness, 4 days before trial began. On September 12, the defense provided the State with approximately 1,000 pages of Falk's medical records. Defense counsel said he turned the records over the day after he received them, but he admitted that he had not requested the records earlier because it was "not high on the priority list of things that needed to get done" on the case.

The district court noted that the case had been pending for 19 months and that there had been a reciprocal discovery order in place for a significant period of time. Finding there was no good reason for the defense to provide the records "at this late date," the court granted the motion in limine and refused to allow Falk to testify. McMillion then made an offer of proof as to the substance of Falk's testimony.

On appeal, McMillion claims the district court erred in refusing to allow Falk to testify. We find no merit to this argument.

[47] Discovery in a criminal case is generally controlled by either a statute or court rule. Therefore, unless granted

as a matter of right under the Constitution or other law, discovery is within the discretion of a trial court, whose ruling will be upheld on appeal unless the trial court has abused its discretion. *State v. Henderson*, 289 Neb. 271, 854 N.W.2d 616 (2014).

[48,49] Whether rooted directly in the Due Process Clause of the 14th Amendment or in the Compulsory Process or Confrontation Clauses of the 6th Amendment, the federal Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. *State v. Henderson, supra*. However, with respect to admission of evidence, a defendant does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence. *State v. Henderson, supra*. See, also, *Taylor v. Illinois*, 484 U.S. 400, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988).

[50-52] The defendant's right to compulsory process is itself designed to vindicate the principle that the ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. *Id.* Rules that provide for pretrial discovery of an opponent's witnesses serve the same high purpose. *Id.* Discovery, like cross-examination, minimizes the risk that a judgment will be predicated on incomplete, misleading, or even deliberately fabricated testimony. *Id.* The State's interest in protecting itself against an 11th-hour defense is merely one component of the broader public interest in a full and truthful disclosure of critical facts. *Id.*

In *Taylor*, the defendant failed to identify a defense witness in response to a pretrial discovery request, instead waiting, until after trial began, to disclose the witness' identity. As a sanction, the trial judge refused to allow the undisclosed witness to testify. On appeal to the U.S. Supreme Court, the defendant argued that that refusal violated his constitutional right to obtain the testimony of favorable witnesses. The Supreme Court rejected the defendant's argument that a

preclusion sanction is never appropriate no matter how serious the defendant's discovery violation may be and upheld the sanction.

Likewise, in the present case, McMillion failed to abide by the pretrial discovery order, which required disclosure of the names and addresses of McMillion's anticipated witnesses by August 27, 2014, and instead, she did not identify Falk until September 5. Moreover, she produced approximately 1,000 pages of medical records for the State's review 3 days after trial began. McMillion's counsel admitted that although he had known that Falk was McMillion's treating physician for some time, he had not requested medical records sooner because it was not a high priority. Thus, sanctioning McMillion in some manner, including disallowing Falk's testimony, was appropriate.

The Nebraska Supreme Court has said that the discovery process is not a game of "'hide the ball'" and that discovery orders must be completed in a timely manner. See *State v. Kula*, 252 Neb. 471, 487, 562 N.W.2d 717, 727 (1997). In *Kula*, the State did not produce material reports until the first day of trial, and thus, the defendant was unable to outline certain witnesses' testimony in his opening statements. The Supreme Court recognized that defense counsel should not have been forced into investigating the content of the reports by night while defending against a murder charge by day. As a result, "[defense] counsel was put in the position of trying [the] case on the run." *Id*. Had Falk been permitted to testify, the State would have been in the same position in the instant case, where it would have been forced to review voluminous medical records at night while prosecuting a case involving multiple felonies by day.

[53] We note that McMillion asserts that there was no discovery violation because she produced the medical records upon receipt. The pretrial discovery order, however, required that McMillion disclose the names and addresses of her witnesses by August 27, 2014, and Falk's name was not disclosed

to the State until September 5, 4 days prior to trial. As such, McMillion failed to comply with the court's discovery order. She also argues the court's sanction exceeded the scope of the State's request, which asked only that Falk be limited in the substance of her testimony. Trial courts have broad discretion with respect to sanctions involving discovery procedures, however. See *State v. Gutierrez*, 272 Neb. 995, 726 N.W.2d 542 (2007), *abrogated on other grounds, State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 749 (2010). We therefore find that the district court did not abuse its discretion in refusing to allow Falk to testify.

## 10. Failure to Give Proposed Jury Instructions

McMillion offered three proposed jury instructions. Proposed instruction No. 1 stated, "'Knowingly' means to be aware of what you [are] doing at the time an act is being committed." Proposed instruction No. 2 stated, "'Knowingly' is a synonym of 'Willfully' and is distinguished from accidentally or involuntarily." Proposed instruction No. 3 stated, "'Willfully' means intentionally and purposely."

In relevant part, instruction No. 6 given to the jury provided: "'Intentionally' means willfully or purposely and not accidentally or involuntarily. 'Knowingly' means willfully as distinguished from accidentally or involuntarily. 'Willfully' means intentionally and purposely."

When discussing McMillion's proposed instructions during the instruction conference, the district court observed that proposed instruction No. 3 was adopted into the given instruction No. 6, and McMillion agreed. The court also observed that proposed instruction No. 2 was "pretty similar" to the given instruction No. 6. The court declined to give proposed instruction No. 1 in any form.

On appeal, McMillion argues that the district court erred in refusing to give her proffered instructions. She acknowledges that the proposed jury instruction No. 3 was contained in the

given jury instruction No. 6 but argues that it should have been given separately. She also asserts that her other two proposed instructions more clearly and correctly stated the definitions of "knowingly" than did the given jury instruction No. 6. She claims that she was prejudiced by the jury's not having been instructed correctly.

[54] Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision. *State v. Ruegge*, 21 Neb. App. 249, 837 N.W.2d 593 (2013).

[55,56] To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *Id*. In reviewing a claim of prejudice from jury instructions given or refused, an appellate court must read the instructions together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and evidence, there is no prejudicial error. *Wilkins v. Bergstrom*, 17 Neb. App. 615, 767 N.W.2d 136 (2009).

[57] McMillion does not argue that the given instructions were an incorrect statement of law or were misleading; she argues only that the court's instructions did not adequately cover the definition of "knowingly." The same argument was tendered in *Wilkins v. Bergstrom, supra*, and this court rejected it. We reiterated that a trial court is not required to give a proffered instruction which unduly emphasizes a part of the evidence in the case. See, *First Mid America, Inc. v. Palmer*, 197 Neb. 224, 248 N.W.2d 30 (1976); *Wilkins v. Bergstrom, supra*.

Likewise here, assuming that the tendered instructions were correct statements of the law and warranted by the evidence, McMillion has not demonstrated that she was prejudiced by failure to give the instructions. The jury was given several

definitions of "knowingly," and adding the proposed instruction No. 1 would have been superfluous and would have unduly emphasized the element of "knowingly," which we note is not a required element for all of the offenses with which McMillion was charged. In short, the instructions given, taken as a whole, correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings.

[58] In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *State v. Iromuanya*, 272 Neb. 178, 719 N.W.2d 263 (2006). McMillion has failed to demonstrate prejudice resulting from the refusal of her tendered instructions. Therefore, this assignment of error is meritless.

## 11. Sufficiency of Evidence

McMillion asserts that the evidence presented at trial was insufficient to sustain her convictions. We disagree.

[59,60] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Escamilla*, 291 Neb. 181, 864 N.W.2d 376 (2015). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

[61] McMillion was convicted of five counts: first degree sexual assault of a child under age 12, incest, two counts of visual depiction of sexually explicit conduct, and child abuse. As charged, a person commits first degree sexual assault of a child when he or she subjects another person under 12 years of age to sexual penetration and the actor is at least 19 years

of age or older. Neb. Rev. Stat. § 28-319.01(1)(a) (Cum. Supp. 2014). Sexual penetration includes fellatio. Neb. Rev. Stat. § 8-318(6) (Cum. Supp. 2014).

The photographs received into evidence depict McMillion performing fellatio on S.M., and McMillion admitted to having done so. S.M. was 7 years old at the time of trial, and thus, he was under 12 years of age when the photographs were taken. McMillion was born in 1981 and was therefore over age 19 at the time the photographs were taken. Accordingly, the evidence is sufficient to support the conviction for first degree sexual assault of a child under 12.

[62] This evidence also establishes the elements of incest. Any person who knowingly engages in sexual penetration with his or her child commits incest. See Neb. Rev. Stat. §§ 28-702 and 28-703 (Reissue 2008). McMillion and Caleb both identified the child in the photographs as S.M., their son. In light of the photographs, McMillion's argument hinged on whether she committed the charged acts "'knowingly.'" Brief for appellant at 41. She claimed at trial that she did not remember performing the acts depicted in the photographs and that she was controlled by Caleb. She also presented expert testimony as to her mental conditions, the fact that she may have been dissociating during the acts, leaving her with no memory of them, and the fact that she had been manipulated by Caleb. However, there was evidence to the contrary, both lay and expert, which the jury found credible. Ultimately, there was evidence presented that McMillion knowingly engaged in sexual penetration with her son, which is sufficient to sustain the conviction of incest.

McMillion was also convicted of two counts of visual depiction of sexually explicit conduct, in violation of Neb. Rev. Stat. § 28-1463.03 (Cum. Supp. 2014). She was charged under two separate subsections of § 28-1463.03, which provide in relevant part:

(1) It shall be unlawful for a person to knowingly make, publish, direct, create, provide, or in any manner

generate any visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers.

. . . .

(4) It shall be unlawful for a parent, . . . knowing the content thereof, to consent to such child engaging in any visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers.

The applicable definition of "[s]exually explicit conduct" includes oral-genital intercourse. See Neb. Rev. Stat. § 28-1463.02(5)(a) (Cum. Supp. 2014). Visual depiction of sexually explicit conduct includes photographs and videos. See § 28-1463.02(6). As such, the State in the present case was required, for one count, to prove that McMillion knowingly generated photographs or videos depicting oral-genital intercourse with a child as one of the participants. For the second count, the State needed to establish that McMillion consented to the participation of her child in photographs or videos depicting oral-genital intercourse with the child as one of the participants.

Caleb's testimony establishes all of the required elements. He testified that in June 2012, he walked into his bedroom and witnessed McMillion performing oral sex on S.M. He testified that he asked McMillion if he could "take a video of what she was doing," and she agreed. Caleb identified the two photographs received into evidence as photographic stills from the video he recorded.

By agreeing to allow Caleb to create videos of the sexual activity between herself and S.M., McMillion knowingly generated visual depiction of sexually explicit conduct with a child as a participant, and she consented to her minor child's participation in a video depicting sexually explicit conduct. Consequently, all of the required elements of both offenses were established by sufficient evidence.

McMillion's final conviction was for child abuse. In relevant part, a person commits child abuse if he or she knowingly or intentionally causes or permits a minor child to be placed in

a situation that endangers his or her life or physical or mental health. § 28-707.

Viewed in a light most favorable to the State, there is sufficient evidence to sustain McMillion's conviction for child abuse. S.M. was diagnosed with adjustment disorder, anxiety disorder, posttraumatic stress disorder, and mood disorder as a result of McMillion's actions. As such, it was rational for the trier of fact to have concluded that McMillion knowingly and intentionally permitted S.M. to be placed in a situation that endangered his physical or mental health.

On appeal, McMillion generally challenges the credibility of the witnesses, which it is well established that we will not reweigh or pass on. Viewed in the light most favorable to the State, the evidence satisfies all of the statutory elements necessary to sustain the convictions.

## 12. Sentencing

McMillion raises several issues related to sentencing.

### (a) Additional Condition Imposed

McMillion first observes that the district court's oral pronouncement of her sentence indicated that S.M. should not "be required" to have any contact with her during her sentences, but the written sentencing order prohibited contact between McMillion and S.M. She urges us to strike the provision contained in the written sentencing order. McMillion further argues that imposing a condition restricting contact with S.M. was impermissible under the sentencing statute contained in Neb. Rev. Stat. § 28-105 (Cum. Supp. 2014).

The State claims that any issue relating to McMillion's ability to have contact with S.M. is moot because McMillion's parental rights to S.M. are no longer intact and he has been adopted. The State asks that we take judicial notice of the case from the separate juvenile court of Sarpy County involving McMillion and S.M.

[63,64] The Nebraska Supreme Court has recognized that, as a subject for judicial notice, existence of court records

and certain judicial action reflected in a court's record are, in accordance with Neb. Rev. Stat. § 27-201(2)(b) (Reissue 2008), facts which are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned. *Gottsch v. Bank of Stapleton*, 235 Neb. 816, 458 N.W.2d 443 (1990). Thus, a court may judicially notice existence of its records and the records of another court, but judicial notice of facts reflected in a court's records is subject to the doctrine of collateral estoppel or of res judicata. *Id.*

[65,66] Further, under § 27-201(6), judicial notice may be taken at any stage of the proceeding. Proceeding under this section has been found to include judicial activity which occurs after commencement of an action and includes judicial action in an appeal. See *Gottsch v. Bank of Stapleton, supra.* Section 27-201(4) provides that a judge or court shall take judicial notice if requested by a party and supplied with the necessary information.

The State, in the instant case, asked that we take judicial notice of the related juvenile case and provided the case number. We judicially notice that in that case, McMillion relinquished her parental rights to S.M. and he has been adopted. The juvenile court terminated its jurisdiction over S.M. on March 17, 2015, and the time for appeal has passed.

[67,68] A natural parent who relinquishes his or her rights to a child by a valid written instrument gives up all rights to the child at the time of the relinquishment. *Monty S. & Theresa S. v. Jason W. & Rebecca W.*, 290 Neb. 1048, 863 N.W.2d 484 (2015). After a decree of adoption has been entered, the natural parents of an adopted child shall be relieved of all parental duties and responsibilities for the child and shall have no rights over the child. Neb. Rev. Stat. § 43-111 (Reissue 2008).

[69] Because McMillion relinquished her parental rights to S.M. and his adoption has been finalized, McMillion's rights to S.M. have been extinguished. She therefore has no legal right to have contact with him. Consequently, the issues before us as to the contact condition pronounced by the district court

and that included in the sentencing order are moot. See *In re Interest of Nathaniel M.*, 289 Neb. 430, 855 N.W.2d 580 (2014) (issue is moot when it seeks to determine question which does not rest upon existing facts or rights, in which issues presented are no longer alive).

### (b) Consecutive and Excessive Sentences

McMillion asserts that her case should be remanded for resentencing due to the district court's uncertainty as to whether consecutive sentences were required. She also claims that regardless of the requirements, the court erred in imposing consecutive as opposed to concurrent sentences, and that her sentences are therefore excessive. We find no abuse of discretion in the sentences imposed.

First degree sexual assault of a child under 12 is a Class IB felony with a mandatory minimum sentence of 15 years in prison for the first offense. § 28-319.01(2). Generally, Class IB felonies carry a sentencing range of 20 years' to life imprisonment. § 28-105. McMillion was sentenced to 30 to 50 years' imprisonment.

Incest, under the statute applicable at the time, was a Class III felony. § 28-703(2). Class III felonies were punishable by 1 to 20 years' imprisonment at the time McMillion was sentenced. § 28-105(1). McMillion's sentence for this offense was 1 to 5 years' imprisonment.

Visual depiction of sexually explicit conduct committed by a person who is 19 years of age or older is a Class ID felony, which is punishable by a mandatory minimum sentence of 3 years' imprisonment and a maximum of 50 years' imprisonment. Neb. Rev. Stat. § 28-1463.04 (Cum. Supp. 2014) and § 28-105(1). McMillion received sentences of 3 to 5 years' imprisonment for each of these offenses.

Child abuse, as charged in the information, is a Class IIIA felony if it is committed knowingly and intentionally and does not result in serious bodily injury or death. § 28-707.

Class IIIA felonies are punishable by a maximum of 5 years' imprisonment. § 28-105(1). The court sentenced McMillion to 2 to 5 years' imprisonment for this crime.

McMillion's sentences all fall within the statutory limits. Her convictions for sexual assault and both counts of visual depiction of sexually explicit conduct carry mandatory minimum sentences, but none of the applicable statutes requires consecutive sentences. There was discussion between the parties and court at sentencing as to not only whether those offenses carried mandatory minimum sentences but whether those sentences were also required to be served consecutively.

[70-72] Generally, it is within a trial court's discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively. *State v. Lantz*, 290 Neb. 757, 861 N.W.2d 728 (2015). The Supreme Court recently clarified that not all convictions carrying a mandatory minimum sentence must be served consecutively to all other sentences. See, *id.*; *State v. Berney*, 288 Neb. 377, 847 N.W.2d 732 (2014). Rather, a court is required to order consecutive sentences only for those specific crimes that require a mandatory minimum sentence to be served consecutively to other sentences imposed. *State v. Lantz, supra*. If the conviction requires only a mandatory minimum sentence but the statute does not mandate that the minimum sentence run consecutively to other sentences, the decision as to whether to run the sentences consecutively or concurrently is left to the sentencing court. See *id*.

Although the district court expressed uncertainty as to whether consecutive sentences were required, we find nothing in the record indicating that it acted under the mistaken impression that it was, in fact, required to order consecutive sentences. The court found that regardless of "whether those mandatory minimums mandate consecutive sentences," the nature of the offenses merits consecutive sentences. This finding was within the district court's discretion. And we find that this conclusion was not an abuse of that discretion.

Nevertheless, McMillion challenges her sentences, arguing that her sentences should have been ordered to be served concurrently. We disagree.

[73,74] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Casares*, 291 Neb. 150, 864 N.W.2d 667 (2015). It is within the discretion of the trial court to direct that sentences imposed for separate crimes be served consecutively. *State v. Elliott*, 21 Neb. App. 962, 845 N.W.2d 612 (2014). The test of whether consecutive sentences may be imposed under two or more counts charging separate offenses, arising out of the same transaction or the same chain of events, is whether the offense charged in one count involves any different elements than an offense charged in another count and whether some additional evidence is required to prove one of the other offenses. *Id*.

Here, it is clear that each of the offenses of which McMillion was convicted is a separate offense containing different elements. We have discussed the required elements of each offense above and summarized the evidence presented to sustain the convictions. In short, because additional evidence is necessary to prove the elements of each of the offenses, it was within the district court's discretion to impose consecutive rather than concurrent sentences for the separate crimes. We therefore find no abuse of discretion in the sentences imposed.

## V. CONCLUSION

For the foregoing reasons, we find no merit to any of the issues raised on appeal. Therefore, we affirm the convictions and sentences.

AFFIRMED.